**Timothy Michael FORDER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 42879.**

Court of Criminal Appeals of Texas.

June 2, 1970.

On Rehearing July 22, 1970.

Turner & Eaton, by John Eaton, San Angelo, for appellant.

O. L. Parish, Jr., County Atty., Ballinger, Royal Hart, Dist. Atty., San Angelo, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

BELCHER, Judge.

The conviction is for murder; the punishment, ninety-nine years.

At the time of the alleged commission of the offense the appellant was sixteen years of age. The Juvenile Court of Runnels County, the county in which the alleged offense occurred, waived jurisdiction and certified the appellant to the District Court under the authority of Article 2338–1(6), Vernon's Ann.Tex.Civ.St., to be tried as an adult. The District Court of Runnels County granted a change of venue to Tom Green County where

the trial was had from which this appeal was taken.

The appellant contends that the basic requirements of due process and fundamental fairness were not accorded the appellant in that his mother was not notified of the charges against him or of his right to the presence and assistance of counsel "(a) before exclusive juvenile jurisdiction over him was waived and (b) before he had made certain incriminating statements against himself."

The record reflects that the appellant was declared a delinquent child by the Juvenile Court in El Paso, Texas at the age of ten and was thereafter a resident of West Texas Boys Ranch in Tom Green County, Texas until he was released in 1965. In 1967 he was declared a delinquent child by the Juvenile Court of Indianapolis, Indiana where he was placed on probation. The father of the appellant was killed in an automobile accident in 1964, and the appellant's mother resided in Indianapolis, Indiana.

The record reflects that when the appellant was permitted to place a telephone call to his mother, she refused to accept the costs for the call, and the appellant was unable to talk with her.

The court summary prepared for the Juvenile Court of Runnels County, Texas and made a part of the record at the hearing on the question of waiver of jurisdiction to the District Court reveals the following attempt to notify the appellant's mother of his situation:

"In an effort to comply with juvenile procedures, several methods have been applied to assure TIM'S mother received notification of his situation and circumstances. The Hon. County Attorney, MR. O. L. PARISH, JR., of Runnels County, Texas, mailed a registered, special delivery, air mail letter on 11-21-67 to her at 2830 Robison, Indianapolis, Indiana, which was returned on/about 11-28-67 marked 'Moved—left no forwarding address.' MR. HENRY WARFIELD, Probation Officer, Juvenile Center, Indianapolis, Indiana, advised me by telephone that he had personally gone out to her current residence, 1326 North New Jersey Street, Apt. #2, Indianapolis, Indiana, and advised MRS. FORDER of TIM'S situation. I sent her a wire through Western Union on November 22, 1967, advising her of TIM'S situation; of the planned juvenile hearing for December 5, 1967; of the letter MR. PARISH had mailed to her old address; that she should contact the post office reference the delivery of the letter; and requested that she notify me by collect wire or telephone call of her intent to come to the hearing. Having heard nothing by December 1, 1967, I requested confirmation of the delivery of my wire. Confirmation was received from Indianapolis Western Union on December 2, 1967, that my wire was delivered to MRS. PATRICIA ANN FORDER at 9:00 A.M. EST on November 23, 1967."

The hearing on the petition filed on October 31, 1967, in Juvenile Court, where counsel was appointed, to transfer jurisdiction of the appellant to the District Court was held on December 13, 1967. The appellant's mother, therefore, was notified of the situation prior to the hearing in Juvenile Court.

The record further reflects that the appellant, when he was first arrested, told the arresting officer, William A. Sneed of the Texas Department of Public Safety that he was seventeen years old, and it was not until after the appellant confessed to Sheriff Atkins, who then called the appellant's probation officer in Indianapolis, Indiana, that Atkins was informed that the appellant was only sixteen years of age.

■ Under the above facts and those set out under the appellant's grounds of error four and eight, the alleged failure to notify the appellant's mother before the

hearing in Juvenile Court and before the taking of the confession and the failure to take the appellant before the Juvenile Court immediately upon arrest do not constitute grounds for reversal of this case.

The appellant's fifth ground of error is overruled.

The fourth and eighth grounds are that:

"The trial court erred in admitting into evidence certain in-custody statements made by the defendant in the nature of an oral confession and in admitting into evidence a razor and some money found as a result of these inadmissible utterances"; and that the chain of custody of the razor was not established and the money was not properly identified.

The testimony reveals that Officer Sneed, Texas Highway Patrolman, found the appellant and Larry Ward about 4:20 a. m., October 15, at the scene of a traffic accident; that appellant told him he was seventeen years old and was riding in the rear seat of the car when it ran off the road; that he found a body beside the car with the throat cut. He further testified that the appellant and Ward were drunk and he placed them in jail about 6 a. m., Sunday morning, October 15. Sheriff Atkins talked with the appellant Sunday night, warned him of his rights, and when the appellant said he did not care to make a statement he left. Next, the appellant was taken before a magistrate about 12:25 p. m., Monday, October 16, where he was told of the drunk charge and the complaint filed against him for the murder of Johnny Adair, and then he was duly and properly warned of his rights, and again declined to make any statement.

Sheriff Atkins testified before the jury as follows:

"Q Now, when did you see Forder (appellant) again?

"A I saw him, the next time was on the 16th of October about 2:30 P.M., in the afternoon.

"Q And where were you when you saw him?

"A Well, I had reason to go back to the scene of the accident, and I went to the jail. I expected to meet two more officers over there and one or two men that wasn't officers. We were going out to make a thorough search again.

"Q At that time had you found the instrumentality that could have been used to make that laceration in the neck?

"A Up to that time?

"Q Yes, sir.?

"A No, sir.

"Q You said you were going out to the scene?

"A Yes, sir.

"Q Did you see Forder over at the jail?

\* \* \* \* \* \*

"A I was standing on the jail steps waiting for the people to get together and go back to the scene of the accident; and Forder got out of the car ahead of Teatsworth, and Mr. Teatsworth heard the same thing, and there was a few words said between us. I think I asked him how he was getting along and if his finger felt all right, or something. I believe he said it was all right. Then he says, 'that little wall up there between the mugg room and your office isn't very sound proof.' I said, 'what do you mean, Tim?' He said, 'I heard Ward cop out on me, but I cut the son of a bitch's throat myself.'

"Q Who said that?

"A Tim Forder.

"Q The defendant seated here told you he cut the son of a bitch's throat himself?

"A  ·He did so, and I says, 'Tim, you don't mean that?' He said, 'Yes, do. I can carry you to where the murder weapon is.'

"Q  What did you do next?

"A  Well, naturally, I took him to the scene of the accident.

"Q  On the way out did you have any conversation with him?

"A  Yes, sir. Mickey Brown drove and Tim and I talked, and I pulled the Miranda warning out again and said, 'Tim, I want to read this to you.' He said, 'Sheriff, you don't have to read it. I know it by heart.' I said, 'I want to read it anyway, because we are going to the scene of the crime,' and I did read it to to him again.

"Q  Did you ask him whether or not he wanted a lawyer?

"A  Yes, sir. It states there in the warning.

"Q  What did he say?

"A  No, he didn't want a lawyer appointed by the Court of Ballinger; he would get one later from Indianapolis; his mother would hire him.

"Q  How did you know where to go?

"A  I didn't know where to go.

"Q  How did you find out?

"A  Tim told me.

        *   *   *   *   *   *

"Q  And whereabouts along the highway to go, is that right?

"A  Yes, sir.

"Q  He told you how hard he threw it in that direction?

"A  He didn't know exactly. He threw it pretty hard out in this pasture, which is sheep wire and a three barbed wire fence.

"Q  After the defendant said he threw it over that fence did he point in the direction?

"A  General direction.

"Q  What happened then?

"A  Well, the District Attorney and two officers from San Angelo, three deputies, three or four newsmen, everybody piled over this fence here, and the razor, the weapon was located, yellow handle razor, up here; and I was working down on this end when they yelled to me the weapon was found out here; and when I got down there Tim had it in his hand. I said, 'Tim, let me put—

"Q  If you will, have a seat back there, Sheriff. Did Forder crawl over the fence?

"A  Yes, sir.

"Q  Did he say he didn't want to go out there, anything like that?

"A  No. He wanted to go.

"Q  Did he voluntarily go back out there with you, Sheriff?

"A  Yes, sir, he wanted to go.

"Q  Did he voluntarily tell you where to look?

"A  The general place where to look.

"Q  Did he go out and start looking in that area himself?

"A  Well, we certainly wouldn't have looked the other side of the highway; we couldn't have found the razor if he hadn't show us where it was.

"Q  If the defendant hadn't shown you where it was you couldn't have found it?

"A  It still would have been there.

"Q  At the time Forder showed you where the razor was did you have any idea it was where it was found?

"A No, I thought it would be around the scene of the accident.

\* \* \* \* \* \*

"A I think I told Teatsworth, Deputy Teatsworth, to take the yellow handle razor from Forder and wrap it in a handkerchief. Forder remarked—

"Q Just a minute; been ruled no further comment there on what the conversation might have been. And then what did Teatsworth do with the razor?

"A Went back to my office, and I taken my nail clippers and scraped a little mark on one side and put it in an envelope and sealed it, dated it, initialed it and put it in my desk.

"Q Would you describe the razor?

"A Yes, sir. It is a straight razor like a barber would use with yellow handles.

"Q Did that razor ever leave your possession after that?

"A Yes, sir.

"Q To what person did you give the razor?

"A A few days later we had a meeting, peace officers meeting at Eden, Texas, West Central Law Enforcement meeting, and I knew Jack Tean Mercer would be there, and I wanted to send the razor to the lab for fingerprints or anything else they might find, and that would save me a trip, and I carried the razor and turned it over to Mercer.

"Q Who is Mercer?

"A Supervisor of the latent fingerprint section of the Department of Public Safety.

"Q Did you put your mark on it before?

"A Yes, sir, I put my mark on it before. I haven't scraped the blood off to see if there is any other mark on it.

"Q Did you put a distinctive mark on it?

"A Distinctive to me.

"Q One you could recognize; if you had 50 laid out there could you pick out the one you marked?

"A Not unless one had a scrape on it like—

"Q Did you put a particular identifying mark on it, though?

"A Yes, sir.

"Q After this razor was sent by you to the lab at Austin did you ever get it back?

"A Yes, sir.

"Q Been in your care, custody and control since?

"A Yes, sir.

"Q You have it among your file now?

"A Yes, sir.

\* \* \* \* \* \*

"Q Do you know whether or not Forder was given another warning by the Judge after he got back to the courthouse?

"A I do know that.

"Q He was or wasn't?

"A He was.

"Q Then after the other warning— what Judge was that?

"A Judge D. W. Turner.

"Q Was Forder brought back to your office?

"A Yes, sir.

"Q While seated in your office did you have an interview with Forder?

"A  Yes, sir.

"Q  During the course of that interview did he make any statement about anything you were not talking to him about?

"A  Mid-way through the interview of our conversation he stopped me and told me about some money he had throwed into the wall. We got a telephone switch box in the interrogation room, and I don't know whether he opened the lid or not but it went down between the walls, and I told Jack Jones and some other officers standing around, the office was full of people, outside the door; pretty close to six or seven people in there.

"Q  What did he tell you; tell us what he told you; what he said about the money being where it was?

"A  He said he had the money hid in his boot; said we didn't search people very closely; he had taken the money the night before when I had him talk to Ward and put it in this wall, telephone receiver switch box, and it fell down in the wall.

"Q  Did he say anything else about the money?

"A  Yes, sir. He said he got the money from the deceased's right hand pocket.

"Q  Got it from his right hand pocket; of who?

"A  Deceased.

"Q  Did he say anything else about the money at that time?

"Court: Mr. Hart, bear in mind I made a ruling in there.

"Q  And without referring any further to his conversation did you give any directions to any of your deputies or other people that were there?

"A  Yes, sir, I believe I told Teatsworth and Jack Jones, who is a member of Id. in the detective police division of the department here, to see if he could locate the money; and I continued my interview with Tim.

"Q  Was any money later delivered to you?

"A  Yes, sir. Deputy Sheriff John Wilson, a few minutes later—I could hear—well, like this is my office, this is another room, it is a little interrogation room off of my office where you could hear hammering going on—in a few minutes Deputy Sheriff Wilson brought me some money.

"Q  Do you have that money with you now which was in the file?

"A  Yes, sir.

"Q  Has it been in your care, custody and control ever since Johnny Wilson gave it to you?

"A  It has been locked in my desk ever since.

"Q  Been in your care, custody and control?

"A  Yes, sir.

"Q  Would you take it out of your file, please, sir? Lay it out of the envelope. Is it an envelope?

"A  Yes, sir.

"Q  Would you look and see what is in there without taking it out; is that the money?

"A  Yes, sir.

"Q  You are referring to State's Exhibit No. 5 here?

"A  Yes, sir.

"Q  And I ask you again, is the money enclosed in here in State's Exhibit No. 5, is that the money that J. D.

Wilson or Johnny Wilson gave to you on that occasion?

"A   Yes, sir.

"Q   And has State's Exhibit No. 5 been in your care, custody and control since then?

"A   It has.

"Q   Was that the only money that Mr. Wilson gave to you on that occasion?

"A   Yes, sir.

\*   \*   \*   \*   \*   \*

"Q   Can you upon examination of the razor positively say whether or not that is in fact the same razor that you gave Mercer to take to Austin?

"A   That Forder handed me?

"Q   Can you say that is the same?

"A   Yes, sir, I will swear to that.

"Q   By the special mark you put on it?

"A   Yes, sir.

"Q   Can you say that's the razor Forder handed you in the pasture?

"A   Yes, sir."

■   The court held a hearing in the absence of the jury on the admissibility of the oral statements in evidence. The trial court found that the appellant was duly warned of his rights in accordance with the law and that said oral statements were freely and voluntarily made and were admissible in evidence. The record supports the findings of the court. The voluntary character of appellant's oral statements were submitted to the jury.

Appellant's companion, Larry Ward testified for the state, and his testimony is in accord with the statements of the appellant. The court charged the jury that Ward was an accomplice as a matter of law and applied the law of accomplice testimony to that given by him.

■   The evidence pertaining to the chain of custody of the razor and its identity and the identity of the money was sufficient to authorize their admission in evidence.

Grounds of error numbers four and eight are overruled.

■   The tenth ground of error asserts that: "The Texas oral confession statute is unconstitutional."

The contention does not mention either the United States or Texas Constitutions, and it does not point out or specify any defect as a basis for the invalidity of the statute. Appellant refers to Wigmore on Evidence for support. No error is perceived. The tenth ground of error is overruled.

■   The sixth ground is that, "The trial court erred in excluding testimony from the witness Robert W. Turner."

The witness Turner was an adult probation officer and had spent several hours on two separate days with the appellant.

When Turner was asked for his opinion on whether appellant was sane or insane he replied: "My opinion was that he was emotionally disturbed. This I couldn't say; I am not, do not feel qualified to say a person is sane or insane with respect to the definition of sane or insane."

Although the appellant does not specify in his ground of error the particular testimony which he claims was excluded, the testimony has been examined and considered, and it is concluded that no error is reflected.

■   It is contended that there is a fatal variance between the allegations of the indictment that appellant killed Johnny Adair and the F.B.I. fingerprint record that deceased's name was William Walter Wallace.

The deceased's employer testified that he knew him only as Johnny Adair, the ac-

complice Ward who was with the deceased before and at the time he was killed knew him as Johnny, and the record testimony during the guilt stage of the trial consistently refers to him as Johnny Adair. The only evidence that deceased bore the name of William Walter Wallace was that of Sheriff Atkins who testified that the F.B.I. fingerprint report showed that to be his name. It does not appear from the record that this variance misled appellant or prejudiced his rights on this trial. 30 Tex.Jur. 2d 650, Sec. 65. The seventh ground of error is overruled.

■ The appellant contends that the trial court erred in refusing to grant his amended motion for new trial based upon jury misconduct and the unsworn testimony of the district attorney before the jury which was incorrect as a matter of law.

To his amended motion for new trial the appellant attached a single affidavit signed by six of the trial jurors; and on the hearing of the motion it was introduced. No oral testimony was offered on the motion. The affidavit recites that "I believed" from the evidence that appellant was insane at the time of the commission of the offense and at the present time and he needed hospitalization, which was discussed at length before the issues were answered; that "I believed" that since the Rusk doctors testified he was sane, and that he would be sent to Rusk if found insane where he could not be held more than 90 days and probably no more than 30 days before release which "I believed" was not good for him or society. Next, the affidavit recites that: "It was only because of this that I agreed to the answer of 'sane' to the sanity issues"; and if he had known he could not have been released without another jury trial "I would" have insisted that he be found insane. Also, that they discussed and "I believed" that it was necessary to give him 99 years in order to confine him for ten or fifteen years.

The contention as to the unsworn testimony arose during the cross-examination of

Dr. Walker who was called by the appellant. The state examined Dr. Walker pertaining to the procedure followed in handling persons found insane and later when they were found to be mentally competent. At the time this testimony was adduced the appellant made no objection thereto. At the sole instance of the court the jury was retired. At this time the court questioned the district attorney pertaining to the validity of the procedure he had developed as to when a person is found insane and sent to Rusk and when they are later found sane. It was at this point that the appellant objected on the ground that the state had developed incorrect statements as to the legal procedure in handling persons committed to Rusk. After extended discussion between the court and the attorneys, the jury was returned. At this time the court directed that the testimony of Dr. Walker which was in question be read to the jury. Following the reading of said testimony the court charged the jury as follows:

"You are instructed that it is not the law that if a man is found insane at the time of the offense he is sent to Rusk, and it is not the law that if a man is sent to Rusk he is released forever or even released upon the certificate of the doctors at Rusk. You will, therefore, cast out of your minds and wholly disregard the questions asked by Mr. Hart and the answers by Dr. Walker which I have just quoted (read) to you."

The alert and cautious trial judge interceded to recast the alleged "unsworn testimony" developed by the state on the cross-examination of Dr. Walker, and his instructions to the jury as shown was not then objected to and no complaint is here made to them.

It has been the consistent holding of this Court that a juror will not be permitted to impeach or explain his verdict by showing the reason for the conclusion reached. 41 Tex.Jur.2d 426, Sec. 198; Frias v. State, 169 Tex.Cr.R. 549, 335 S.W.2d 765; Gonzales v. State, Tex.Cr.App., 398 S.W.2d

132; McDonald v. State, Tex.Cr.App., 415 S.W.2d 201.

The trial court did not abuse his discretion in refusing to grant the motion for new trial as urged in grounds of error one and two.

The third ground of error is that "the evidence in this case was not sufficient to support the jury finding of sanity concerning this boy's mental condition."

An accused is presumed to be sane. The burden is on the accused in the absence of an unvacated judgment of insanity to show by a preponderance of the evidence that he was at the time insane. 16 Tex.Jur.2d 210, Sec. 91; Cross v. State, Tex.Cr.App., 446 S.W.2d 314. However, the state introduced expert and lay testimony that the appellant was sane at the times here in question. In light of the record the third ground of error is overruled.

In ground of error number nine the appellant contends that the court erred in refusing his request to include in its definition of insanity the element of independent impulse or all of the elements suggested in the Model Penal Code defining insanity as a defense.

The definition given was in the terms ordinarily used in defining insanity in Texas. The failure to define insanity as requested was not error. This ground of error is overruled.

The appellant did not testify.

The judgment is affirmed.

## OPINION ON MOTION TO DISMISS WHILE ON REHEARING

ONION, Judge.

It has been made to appear by motion to dismiss this appeal filed by our State's Attorney supported by affidavits that after the appeal was filed in this Court and while motion for rehearing was pending before this Court, the appellant escaped from the Tom Green county jail on June 18, 1970, and was at large until he was apprehended some eight miles from the said jail and returned to custody during the early morning hours of June 19, 1970.

The appeal should be dismissed under the provisions of Articles 44.09 and 44.10, Vernon's Ann.C.C.P., and under the holdings of this Court in McGee v. State, 436 S.W.2d 340; Leopard v. State, 429 S.W.2d 150 and Vaughn v. State, 456 S.W.2d 141.

The State's motion to dismiss is granted and the appeal is dismissed.