STATE OF NORTH CAROLINA v. EDWARD A. DAWSON

No. 73

(Filed 14 April 1971)

1. Criminal Law § 71; Homicide § 15— homicide prosecution — evidence of defendant's attitude after the homicide — shorthand statement of fact

In a prosecution charging defendant with homicide by kicking the victim to death, it was proper to admit testimony that, when defendant was describing to others how hard he had kicked his victim, he "seemed to be joking about it;" the reference to defendant's jocular mode of expression was admissible as a shorthand statement of fact.

2. Criminal Law § 162— general objection to evidence — review on appeal

When a general objection to evidence is interposed and overruled, it will not be considered reversible error if the evidence is competent for any purpose. Rule of Practice in the Supreme Court No. 21.

3. Criminal Law § 43; Homicide § 20— photographs of homicide victim — admissibility

Photographs of a homicide victim were admissible over the defendant's general objection for the limited purpose of illustrating the testimony of the witnesses, where it was shown that (1) the witnesses were familiar with the victim and (2) the photographs accurately portrayed the victim.

4. Homicide § 1— prosecution — proof of corpus delicti

The requirements sufficient to establish the *corpus delicti* in homicide cases are: (1) there must be a corpse, or circumstantial evidence so strong and cogent that there can be no doubt of the death and (2) the criminal agency must be shown.

5. Homicide § 20; Criminal Law § 43— proof of homicide corpus delicti — use of photographs

Photographs are admissible to illustrate testimony establishing the *corpus delicti* in a homicide prosecution.

6. Homicide § 21— proof of corpus delicti — identity of homicide victim

In establishing the *corpus delicti* in a homicide case, the State offered sufficient and competent evidence, through the examining pathologist and other witnesses, to show that the body on which the autopsy was performed was the body of the homicide victim named in the bill of indictment.

7. Homicide § 21— proof of corpus delicti — criminal agency

In establishing the criminal agency element of *corpus delicti*, testimony by the examining pathologist and by eyewitnesses was sufficient to show that the victim's death was caused by the defendant's kicking him in the head.

State v. Dawson

8. **Homicide § 15; Criminal Law §§ 34, 86— impeachment of defendant — evidence tending to show guilt of other crimes**

In a prosecution charging defendant with homicide by kicking the victim to death, the State's evidence that defendant had been involved in a fracas at a high school gymnasium earlier on the evening of the homicide, *held* admissible to impeach the defendant's testimony that, as a result of disabling injuries from falling off a horse, he was in no physical condition to kick anyone on the night of the homicide. The fact that the State's evidence might have tended to show defendant's guilt of an independent crime did not affect its admissibility.

9. **Witnesses § 6; Criminal Law § 89— impeachment of witnesses — scope of examination**

Questions designed to impeach the witness, if relevant to the controversy, may cover a wide range and are permissible within the discretion of the court.

10. **Criminal Law § 76— statements of minor defendant — admissibility — absence of mother from interrogation room**

The in-custody statements of a minor defendant were not rendered inadmissible by the fact that the mother of the defendant had not been apprised of the son's constitutional rights and was not allowed to be present at the interrogation.

11. **Criminal Law § 75— confessions — test of voluntariness**

The correct test of the admissibility of a confession is whether the confession was, in fact, voluntary under all the circumstances of the case.

12. **Criminal Law § 166— the brief — abandonment of assignments of error**

Assignments of error which are not preserved and properly brought forward in defendant's brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

13. **Criminal Law § 122; Homicide § 23— homicide case — additional instructions**

A trial judge in a homicide case who not only repeated the definitions of voluntary and involuntary manslaughter — as requested by the jury — but who also, "out of an abundance of precaution," repeated the definition of second-degree murder, did not commit prejudicial error.

APPEAL by defendant from *Godwin, S.J.,* July 1970 Criminal Session, WAKE Superior Court.

In a bill of indictment returned by a Nash County Grand Jury at the January-February 1970 Session of Nash Superior Court, defendant was charged with the first degree murder of Jimmie Collie on 22 November 1969 in Nash County. By consent, the case was removed to the Superior Count of Wake County for trial.

State v. Dawson

Upon the call of the case the solicitor announced in open court that the State would not ask for a verdict of murder in the first degree but would seek defendant's conviction of murder in the second degree, voluntary manslaughter, or involuntary manslaughter, as the evidence might disclose.

The testimony of Donald Brake, Danny Radford, William Ray Connie, Bobby Connie, Dennis Eason and Mike Eason tended to show that between the hours of 11 p.m. and 12 o'clock midnight on 22 November 1969, twenty-five or more teenagers gathered at Aycock Park in the City of Rocky Mount to witness a fight between Jimmie Collie and Michael Melvin. Collie and Melvin met at the appointed time and place and agreed it would be a fair fight—one on one. After an exchange of blows, Jimmie Collie knocked Mike Melvin out. James Adams then struck Collie in the mouth with his fist and knocked him down. Larry Powell and Larry Pittman then jumped on Collie at the same time. Defendant Edward Dawson kicked Jimmie Collie three times at that point following which Jimmie Collie arose and ran to his Mustang automobile with Larry Powell and Larry Pittman chasing him. James Adams and Larry Pittman blocked Collie's passage to the front of the Mustang and Collie attempted to go across the hood, whereupon Larry Pittman grabbed Collie's shoe and tripped him so that he fell across the hood face down. Collie rolled over on his back and Larry Powell struck him across the chest with a chain. Jimmie Collie then came off the hood of his car and landed face down on his hands or chest. As soon as Collie hit the ground defendant Edward Dawson started kicking him again and kicked him four or five times. Collie's head was on the curb and the remainder of his body in the street. When defendant Dawson first kicked him, "Jimmie was face down in the grass right just about an inch off the curb . . . from his top lip up was on the grass and [from] his chin down was on the curb." No one other than Edward Dawson kicked or struck Collie after he left the hood of the Mustang. Edward Dawson was wearing a tie-up, hard shoe, with laces in it—a leather shoe. When defendant Dawson had finished kicking him Jimmie Collie was part way under the car—his legs were on the pavement while his head and shoulders were on the cement curbing. Blood was oozing from Collie's mouth, nose and ears. Defendant Dawson and many others then ran off and Dawson was later seen at the Hamburger Shop. In obedience to a telephone call from the police to his mother, Dawson was taken by his mother to the police station.

William Ray Connie, who had ridden to Aycock Park with Jimmie Collie in his Mustang, knelt beside Collie and began calling his name but got no reaction. Collie had no pulse and was not breathing. William Ray Connie and his cousin Elbert Connie then loaded Jimmie Collie into the Mustang, driving first to the Bobby Connie home and then to Park View Hospital. It was the opinion of Bobby Connie that Jimmie Collie was dead at the time he saw him. It was determined at the hospital that Collie was dead on arrival. The exact time of his death is not revealed by the record.

At the time of his death, Jimmie Collie was eighteen years of age, approximately five feet, eight inches in height, weighed 140 pounds and was in good health.

Dr. Henry Haberyan, an admitted medical expert specializing in pathology, performed an autopsy upon the body of Jimmie Collie at the hospital in Wilson at 10:15 a.m. on 23 November 1969. In Dr. Haberyan's opinion, Jimmie Collie came to his death by reason of trauma or injury to the brain produced by a blunt instrument. After describing superficial lacerations and abrasions about the knees and a relatively minor lesion across the chest, Dr. Haberyan stated that "there were lacerations about the mouth, and of the right ear. These externally, did not appear to be of great severity but upon examination of the brain, a lesion of significance was found beneath the scalp over the right ear and in the bone [at] the base of the brain." The right ear was cut completely through and the margins of the lacerations were too irregular to have been inflicted by a cutting instrument. The autopsy revealed a congestion of blood in and swelling of the brain. The swelling caused compression of the centers in the brain that are concerned with breathing and heart action so that vital functions ceased, causing death due to the accumulation of fluid in the lungs.

Dr. Haberyan further testified that he found nothing which would have caused the death of Jimmie Collie other than the trauma to the head and that in his opinion the head trauma was inflicted by something blunt because there was no laceration of the skin of the scalp. "To external appearances . . . the only thing that could be seen in this area other than the lacerations of the ear, was swelling. So the agent that inflicted the wound would have had to have been something relatively blunt . . . rather than something sharp." He further stated that the head

and brain injury which he described could, in his opinion, have resulted from falling from the hood of a Mustang automobile and striking the head upon the concrete curb or could have been caused by a kick in the head with a shoe. Such a head wound would result in death within five minutes from the time of its infliction.

Edward Dawson, a witness in his own behalf, testified that in November 1969 he was eighteen years of age; that he had heard there was going to be a fight at Aycock Park on the night of November 22, 1969, and "wanted to ride by there to see what was going to happen"; that Jimmie Collie and Mike Melvin fought and Melvin was knocked out; that "Jimmie Collie stood up straddle him and with his legs straddled out and said 'who's next' "; that he helped Mike Melvin to a water fountain sixty to seventy feet away for the purpose of reviving him; that his (Dawson's) left arm was in a cast and his ankle was swollen and painful; that he saw James Adams swing at Jimmie Collie and heard somebody yell "let's get him"; that he saw Larry Powell hit Jimmie Collie with the chain and saw Collie after he was on the ground beside the Mustang but never touched him at any time either with his hands or his feet; that he heard Jimmie Collie say to a person who was bending over him there, "What are you trying to do, kill me?" Defendant stated that Steve Inscoe, who resembles defendant, was the nearest person to Jimmie Collie when he heard Collie make the quoted statement; that Steve Inscoe was wearing a brown corduroy coat, a pair of dungarees, and jungle boots. Defendant said he thereupon left the scene and rode to the Hamburger Shop with a boy named Reddie Hatfield; that in leaving the scene he went up an embankment where he could not see what was in front of him, ran across a pile of bushes or tree limbs that had been piled up for the City, caught his right leg in them and twisted his leg and ankle. He stated that he was having trouble with his ankle that night and it was in such condition he could not have kicked anyone.

Defendant admitted on cross examination that he had not subpoenaed Steve Inscoe, Steve Frye, William Fullford, Ronnie Joyner, Billy Outlaw, Karen Israel, and others, all of whom were present at the fight. He did subpoena and called as defense witnesses Michael Melvin, James Adams, Larry Powell and Larry Pittman, each of whom refused to testify on the ground that it might tend to incriminate him in connection with charges

State v. Dawson

pending against him in Nash Superior Court arising out of the same incident.

Defendant offered evidence by his parents and others tending to show that he is an Eagle Scout; that he was injured when he fell from a horse in September 1969 and in an automobile accident on 2 November 1969, as a result of which his right ankle was sprained, his left arm was placed in a cast from elbow to wrist, and "his hip was hurt," causing difficulty and swelling in his right ankle.

Steve Inscoe, testifying as a rebuttal witness for the State, stated that he never at any time struck or kicked Jimmie Collie on the night in question.

The testimony of Larry Hataway, a Rocky Mount detective, with respect to a statement made by defendant will be discussed in the opinion.

For the purpose of showing the physical condition of the defendant on the evening of 7 November 1969, two weeks prior to the fight in which Jimmie Collie was killed, the State offered the evidence of Mr. and Mrs. David Hendricks. Their testimony was substantially to the effect that Mr. Hendricks was coach at Benvenue School where he gave a party for the football players at the gymnasium on the night of 7 November 1969. Edward Dawson was neither a student nor a football player at that school, but came uninvited and was asked to leave. Defendant left but returned in a half hour accompanied by about fifteen other boys who marched single file into the gymnasium wearing sunglasses and smoking cigarettes, which they extinguished on the floor. Edward Dawson was wearing a cast on his left arm at the time. He and others in his group assaulted David Hendricks, striking him several times. Defendant Dawson, participating in the assault, pressed the arm cast against David Hendricks' neck, was strong and active and had no apparent disability save the cast on his arm. This evidence was offered and received over objection for the sole purpose of showing the physical condition of the defendant at that time and to impeach defendant's testimony that on the night of November 22 he was so disabled by injuries which he had received in a fall from a horse in September and in an automobile accident on November 2, that he could not have struck or kicked anyone.

Following arguments of counsel and charge of the court, the jury returned a verdict of guilty of voluntary manslaughter. A prison term of ten years was imposed by the court and defendant gave notice of appeal to the Court of Appeals. The case was transferred to the Supreme Court under its general referral order dated 31 July 1970.

*Carl E. Gaddy, Jr., Attorney for defendant appellant.*

*Robert Morgan, Attorney General, by Thomas B. Wood, Assistant Attorney General.*

HUSKINS, Justice.

Defendant's first thirty-nine exceptions and assignments of error based thereon are addressed to the admission of evidence. Those which merit discussion will be considered in numerical order.

[1] Defendant initially asserts that the trial court erred in allowing the witness Donald Brake to testify that when defendant, at the Hamburger Shop shortly after the fight, told him he had kicked Jimmie Collie so hard he had sprained his ankle, he "seemed to be joking about it." Defendant claims the witness was thus permitted to state a conclusion which was irrelevant and highly prejudicial in that it indicated an attitude of unconcern on defendant's part. No authority is cited and no reason stated in support of this assignment save the bare assertion that it was irrelevant and prejudicial. For that reason the assignment is deemed abandoned under Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783 at 810. Nevertheless, admission of the evidence was not error. The statement attributed to defendant was highly relevant and material, and defendant's jocular mode of expression was admissible as a shorthand statement of fact. *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469 (1968) ; *State v. Gray,* 180 N.C. 697, 104 S.E. 647 (1920) ; Stansbury, N. C. Evidence (2d Ed., 1963) § 125. This assignment has no merit.

[2, 3] Assignments of Error 2 through 8 relate to the introduction of photographs of the deceased to illustrate the testimony of various witnesses. Viewed in context and in the setting at the trial, it appears that in each instance the familiarity of the testifying witness with deceased was established, and the accuracy of the photograph as a true likeness of Jimmie Collie

was shown. They were offered and admitted over defendant's general objection. When a general objection is interposed and overruled, it will not be considered reversible error if the evidence is competent for any purpose. Rule 21, Rules of Practice in the Supreme Court, 254 N.C. 783 at 803; *State v. Ham*, 224 N.C. 128, 29 S.E. 2d 449 (1944). Even so, the trial judge invariably instructed the jury to consider each photograph for illustrative purposes only and not as substantive evidence. They were competent for the limited purpose stated and their admission was not error. *State v. Casper*, 256 N.C. 99, 122 S.E. 2d 805 (1961), *cert. den.*, 376 U.S. 927, 11 L. Ed. 2d 622, 84 S.Ct. 691 (1964).

Defendant insists, however, that the State sought to use the photographs to establish the *corpus delicti;* that photographs may not be used for that purpose, and therefore the *corpus delicti* was never shown by competent evidence.

[4] "The phrase *'corpus delicti'* means literally the body of the transgression charged, the essence of the crime or offense committed. To establish the *corpus delicti* it is necessary to show the commission of a particular act and its commission by unlawful means." 1 Wharton's Criminal Law and Procedure (Anderson Ed., 1957), § 66. Strong and cogent circumstantial evidence may be sufficient to prove the *corpus delicti* where no direct evidence is available. "The *corpus delicti*, in cases such as we are considering, is made up of two things: first, certain facts forming its basis, and, secondly, the existence of criminal agency as the cause of them." *State v. Williams*, 52 N.C. 446, 78 Am. Dec. 248 (1860). *See also State v. Jones*, 249 N.C. 134, 105 S.E. 2d 513 (1958) ; *State v. Cope*, 240 N.C. 244, 81 S.E. 2d 773 (1954) ; *State v. Cuthrell*, 233 N.C. 274, 63 S.E. 2d 549 (1951). In homicide cases the requirements sufficient to establish the *corpus delicti* are more specific: (1) There must be a corpse, or circumstantial evidence so strong and cogent that there can be no doubt of the death, *State v. Williams, supra;* and (2) the criminal agency must be shown. *State v. Minton*, 234 N.C. 716, 68 S.E. 2d 844, 31 A.L.R. 2d 682 (1952). "The independent evidence must tend to point to some reason for the loss of life other than natural causes, suicide or accident." Rollin M. Perkins, The Corpus Delicti of Murder, 48 Va. L. Rev. 173 (1962).

State v. Dawson

**[5]** Here, defendant argues that the State failed to show by competent evidence that the body upon which the autopsy was performed was the body of Jimmie Collie because the photograph exhibited to the doctor was not competent as substantive evidence and was therefore inadmissible for the purpose of proving *corpus delicti.* This contention is not supported by the decided cases.

Photographs have been held properly admitted, with appropriate limiting instructions, to illustrate testimony establishing the *corpus delicti* in North Carolina and other jurisdictions. *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824 (1948) ; *State v. Miller,* 219 N.C. 514, 14 S.E. 2d 522 (1941) ; *Hines v. State,* 260 Ala. 668, 72 So. 2d 296 (1954) ; *Potts v. People,* 114 Colo. 253, 158 P. 2d 739, 159 A.L.R. 1410 (1945) ; *State v. Myers,* 7 N.J. 465, 81 A. 2d 710, 25 A.L.R. 2d 1171 (1951) ; Annotation, Admissibility of Photograph of Corpse in Prosecution for Homicide or Civil Action for Causing Death, 73 A.L.R. 2d 769 (1960) at § 14; 40 Am. Jur. 2d, Homicide, § 418.

This is in accord with the general rule that "photographs are competent to be used by a witness to explain or to illustrate anything it is competent for him to describe in words." *State v. Gardner, supra.* The photographs must, of course, be properly limited and authenticated, and must be relevant. *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969).

**[6]** Applying these principles to the facts in this case, it appears that Dr. Haberyan, although not previously acquainted with Jimmie Collie, testified that the photograph exhibited to him was a fair and accurate representation of the body upon which he performed an autopsy, and expresed his expert opinion that a kick in the head inflicted by a leather shoe could have caused death. The witness Dennis Eason, who saw Jimmie Collie at the fight in Aycock Park, said he recognized the same photograph which had been shown to Dr. Haberyan as a fair likeness of Jimmie Collie on the night he was killed. The father of the deceased identified the same body as that of his son. Thus there was no failure to connect the subject of the autopsy to the deceased named in the bill of indictment. The assignments of error based on such contention are overruled.

**[7]** Manifestly, there was plenary evidence in proof of the second element of the *corpus delicti.* Several witnesses testified

that Jimmie Collie was kicked in the head by defendant Dawson following which blood was seen running from the victim's mouth, ears and nose. These witnesses observed that the victim had no pulse and was not breathing. Dr. Haberyan testified essentially that death was caused by a skull fracture behind the right ear and near the base of the brain, compressing vital centers controlling the heart and lungs, and that the fracture was caused by a blow inflicted by a blunt instrumentality such as a cement curbing or a leather shoe. There is no evidence in the record that when Jimmie Collie fell from the hood of the car the back of his head struck the curb. To the contrary, the testimony shows that he fell from the hood of the car and landed face down. This points to the conclusion that the blow which caused death was inflicted by Edward Dawson's shoe and greatly weakens the suggestion that Collie's death was attributable to other causes. It was a question for the jury. Defendant's motion for nonsuit was properly denied.

Defendant's Exceptions and Assignments of Error Nos. 9 and 13 through 39 concern the admission of testimony involving a fracas at the gymnasium of Benvenue School on the night of November 7, 1969, at a party given by the coach for his football players. These assignments therefore will be grouped for discussion.

[8] Defendant had testified that due to injuries received when he was thrown from a horse and when he was involved in an automobile accident on November 2, 1969, his physical condition was such that he was unable to kick Jimmie Collie as alleged by the State. On cross-examination the solicitor referred to defendant's professed physical disability and asked: "Didn't keep you from getting into a fight with the coach of the football team at Benvenue School, did it?" Defendant's objection and motion to strike were overruled. Later, over the continued objections of defendant, the State was permitted to elicit rebuttal testimony from Coach Hendricks and his wife to the effect that Edward Dawson was neither a student nor a football player at Benvenue School; that defendant came to the party uninvited and was requested to leave; that he left but returned in a half hour accompanied by fifteen other boys who marched into the gym and assaulted the coach; that defendant pressed the arm cast he was wearing against Coach Hendricks' neck, struck the coach, was strong and active and had no apparent disability save

State v. Dawson

the cast on his arm. This evidence was offered and received for the sole purpose of showing the physical condition of the defendant at that time and to impeach defendant's testimony that on the night of November 22 when Jimmie Collie was killed defendant was so disabled by injuries that he could not have struck or kicked anyone. The jury was specifically instructed to consider the evidence only for that purpose.

[9] The evidence was competent for the limited purpose for which it was admitted. Under the North Carolina rule of wide-open cross-examination, so called because the scope of inquiry is not confined to matters brought out on direct examination, questions designed to impeach the witness, if relevant to the controversy, may cover a wide range and are permissible within the discretion of the court. *State v. Penley,* 277 N.C. 704, 178 S.E. 2d 490 (1971); *State v. Blackwell,* 276 N.C. 714, 174 S.E. 2d 534 (1970); *State v. Sheffield,* 251 N.C. 309, 111 S.E. 2d 195 (1959); *State v. Dickerson,* 189 N.C. 327, 127 S.E. 256 (1925); Stansbury, N. C. Evidence (2d Ed., 1963), §§ 35, 56; 4 Jones on Evidence (5th Ed., 1958), §§ 928-929.

[8] Nor was the testimony of Coach Hendricks and his wife, offered by way of rebuttal to impeach defendant's testimony of his professed physical incapacity, rendered inadmissible by the general rule which prohibits the State from offering evidence of other offenses committed by the defendant on trial. Such evidence, when it "tends to prove any other relevant fact . . . will not be excluded merely because it also shows him to have been guilty of an independent crime." Stansbury, N. C. Evidence (2d Ed., 1963), § 91; *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). Assignments of Error Nos. 9 and 13 through 39 are thus without merit and are overruled.

[10] Appellant next contends that the trial court erred in allowing Detective Hataway to testify in rebuttal that defendant stated during an in-custody interrogation that he kicked the deceased two or three times. The record reveals that upon timely objection a *voir dire* was conducted, at the conclusion of which the judge made findings of fact that before defendant made any statement to Officer Hataway he was fully advised of his constitutional rights and understood them. The judge concluded that any statement made by defendant to the officer was made knowingly, freely and voluntarily. Nevertheless, defendant now contends his incriminating statement was involuntary because his

---

---

mother, who was present at the police station at the time of the interrogation, was not apprised of her son's constitutional rights and was not allowed to be present at the interrogation. In support of this contention, defendant cites *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S.Ct. 1602 (1966), and *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 S.Ct. 1758 (1964).

We find nothing in *Miranda* or *Escobedo* which even remotely supports defendant's position. A confession is not rendered involuntary merely because the person making it is a minor. *State v. Murry,* 277 N.C. 197, 176 S.E. 2d 738 (1970); *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885 (1969); Annotation, Voluntariness and Admissibility of Minor's Confession, 87 A.L.R. 2d 624 (1963). The California Supreme Court in *People v. Lara,* 67 Cal. 2d 365, 62 Cal. Rptr. 586, 432 P. 2d 202 (1967), held that the "totality of circumstances" rule for the admission of out-of-court confessions applies to the confessions of minors as well as adults. The Court said: "We cannot accept the suggestion of certain commentators . . . that every minor is incompetent as a matter of law to waive his constitutional rights to remain silent and to an attorney unless the waiver is consented to by an attorney or by a parent or guardian who has himself been advised of the minor's rights." The Court then concluded: "This, then, is the general rule: a minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." *See also Vaughn v. State,* 456 S.W. 2d 379 (Tenn. Crim. App., 1970); *McLeod v. State,* 229 So. 2d 557 (Miss., 1969); *United States ex rel Walker v. Maroney,* 313 F. Supp. 237 (1970); *Commonwealth v. Darden,* 441 Pa. 41, 271 A. 2d 257 (1970).

[11] So it is with us. The correct test of the admissibility of a confession is whether the confession was, in fact, voluntary under all the circumstances of the case. *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966). While the testimony on *voir dire* is conflicting, there is ample evidence to support the finding that defendant was apprised of his constitutional rights and knowingly and voluntarily made the statement attributed to him. Under

our procedure such findings by the trial judge are conclusive if supported by competent evidence. *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581 (1968) ; *State v. Gray, supra; State v. Barnes,* 264 N.C. 517, 142 S.E. 2d 344 (1965) ; *State v. Outing,* 255 N.C. 468, 121 S.E. 2d 847 (1961).

We are aware of the different procedure used in the federal courts, where an independent examination of the facts is made to determine voluntariness. In earlier federal cases it was held that reviewing federal courts were likewise bound by the facts as found by the trial judge. *See, e.g., Watts v. Indiana,* 338 U.S. 49, 93 L. Ed. 1801, 69 S.Ct. 1347 (1949) ; *Lyons v. Oklahoma,* 322 U.S. 596, 88 L. Ed. 1481, 64 S.Ct. 1208 (1944) ; *Lisenba v. California,* 314 U.S. 219, 86 L. Ed. 166, 62 S.Ct. 280 (1941). In *Watts,* Justice Frankfurter wrote: "On review here of State convictions, all those matters which are usually termed issues of fact are for conclusive determination by the State courts and are not open for reconsideration by this Court." He noted, however, the amorphous nature of a "constitutional fact." More recently, the United States Supreme Court has greatly enlarged the scope of federal independent determination of facts with respect to constitutional rights. *See Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 S.Ct. 1336 (1963) ; *Davis v. North Carolina,* 384 U.S. 737, 16 L. Ed. 2d 895, 86 S.Ct. 1761 (1966) ; *Clewis v. Texas,* 386 U.S. 707, 18 L. Ed. 2d 423, 87 S.Ct. 1338 (1967). In *Davis,* the Court said: "It is our duty in this case, . . . as in all of our prior cases dealing with the question whether a confession was involuntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness." Professor Strong, who recently chronicled this change of scope, observes: "Clearly, 'independent examination of the whole record' means, where deemed necessary to vindication of the constitutional claim, review of facts disputed as well as undisputed." Frank R. Strong, The Persistent Doctrine of "Constitutional Fact," 46 N.C.L. Rev. 223 (1968). Moreover, United States District Courts have wide fact-finding powers exercisable in the determination of federal constitutional claims on *habeas corpus. Townsend v. Sain,* 372 U.S. 293, 9 L. Ed. 2d 770, 83 S.Ct. 745 (1963) ; *Fay v. Noia,* 372 U.S. 391, 9 L. Ed. 2d 837, 83 S.Ct. 822 (1963). *See* J. Skelly Wright and Abraham D. Sofaer, Federal Habeas Corpus for State Prisoners: The Allocation of Fact-Finding Responsibility, 75 Yale L. J. 895 (1966).

Our procedure upholding the findings if supported by competent evidence is grounded on the reliability of the trial judge who hears the testimony on *voir dire,* observes the demeanor of the witnesses, and sits in a more strategic position to judge credibility and determine the true facts with respect to voluntariness. Here, the facts are only weakly disputed and the record strongly supports the findings. All assignments of error addressed to the admission of defendant's statement are overruled.

It is worthy of note that under the law as recently declared by the United States Supreme Court defendant Dawson's statement to the officers, even if obtained in violation of *Miranda,* would be competent on rebuttal (so used here) to impeach and attack the credibility of his trial testimony. In *Harris v. New York,* 39 U.S.L.W. 4281, decided February 24, 1971, the prosecution made no effort in its case in chief to use statements allegedly made by Harris, conceding that they were inadmissible under *Miranda* for that the required warnings of constitutional rights had not been given. Harris took the stand in his own defense and his testimony contrasted sharply with what he told the police shortly after his arrest. In rebuttal, the prosecution was permitted to use his inadmissible statements to the police for the limited purpose of impeaching and attacking the credibility of defendant's trial testimony. The Supreme Court of the United States affirmed, saying: "It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."

[12] Finally, defendant assigns as error several portions of the charge. Since only one assignment is preserved and properly brought forward in defendant's brief, all others are deemed abandoned under Rule 28, Rules of Practice in the Supreme Court, *supra.*

[13] After retiring to consider its verdict, the jury returned and requested the court to repeat its definitions of voluntary and involuntary manslaughter. The trial judge, "out of an abundance of precaution," repeated his charge as to second degree murder and then detailed the circumstances which legally reduce that crime to manslaughter, voluntary or involuntary, as the jury might find from the evidence. Defendant assigns this as

error, contending that its effect was to cause the jury to reconsider second degree murder as a possible verdict and perhaps to find defendant guilty of voluntary rather than involuntary manslaughter. This contention has no merit.

It is true that a judge who is requested by the jury to reiterate his instructions on some particular point is not required to repeat his entire charge. *McGaha v. State,* 216 Ark. 165, 224 S.W. 2d 534 (1949) ; 23A C.J.S., Criminal Law, § 1376 (d) ; 53 Am. Jur., Trial, § 942. Indeed, needless repetition is undesirable and has been held erroneous on occasion. 53 Am. Jur., Trial, § 559. But where a careful trial judge, as here, repeats his definition of second degree murder for the express purpose of delineating the law and clarifying its application to factual situations requiring a verdict of voluntary or involuntary manslaughter, his diligence will be commended rather than condemned. Even had the repetition been erroneous, which is not conceded, no prejudice resulted because the jury returned a verdict of voluntary manslaughter and thus acquitted defendant of second degree murder. The matter complained of was entirely harmless and the assignment of error based thereon is not sustained.

Prejudicial error in the trial below has not been shown. The verdict and judgment must therefore be upheld.

No error.