STATE OF NORTH CAROLINA v. JOEL DEAN STEPHENS

No. 18

(Filed 3 June 1980)

1. Criminal Law § 62— polygraph test—results inadmissible

Results of a polygraph test are not admissible in evidence to establish the guilt or innocence of an accused.

2. Criminal Law §§ 62, 75— incriminating statements during interrogation—statements not result of polygraph test—admissibility

The fact that defendant's incriminating statements to an SBI agent were made in a polygraph testing room was irrelevant on the question of their admissibility, since the challenged statements were not the result of any polygraph test and, if otherwise competent, were admissible.

3. Criminal Law §§ 75.4, 75.11— right to counsel—privilege against self-incrimination—defendant tricked into waiving rights—statements not voluntary

Defendant was tricked or cajoled into waiving his right to counsel and his privilege against self-incrimination, and his statements to an SBI agent therefore were not voluntary, where the evidence tended to show that defendant and his attorney went to SBI headquarters in Raleigh for defendant to be given a polygraph examination; defendant and his attorney were told that the examination would consist of the polygraph test itself and an interrogation; they were also told that the attorney could not be present during the test phase but he would be allowed to be present during the interrogation phase; contrary to this advice, defendant's attorney was left outside the examination room during the test and the interrogation; the attorney, who could neither

see nor hear what was transpiring, thought the testing phase was still in progress; and defendant himself apparently assumed that his lawyer would be admitted to the room at the proper time.

DEFENDANT appeals from judgment of *Wood, J.,* entered at the 4 June 1979 Criminal Session, RANDOLPH Superior Court.

Defendant was charged in separate bills of indictment, proper in form, with the murder of his grandparents, DeLacy Fogleman and wife, Ethel Jarrett Fogleman on 4 April 1976.

The State's evidence tends to show that on Sunday morning, 5 April 1976, Ethel Fogleman's father, age eighty-eight, went to the Fogleman home to see why they had failed to attend church that morning. He found Mr. Fogleman's body in a pool of blood on the floor in the kitchen and found Ethel Fogleman's body on the bed in the master bedroom. Officers were summoned. Examination of the bodies revealed that both had died from gunshot wounds. Dresser drawers had been pulled out. A wallet with papers and other articles were found scattered on the bed. Included among the papers was Mrs. Fogleman's expired driver's license which was found near the wallet. A fingerprint lifted from Mrs. Fogleman's expired driver's license was later compared with defendant's fingerprints, and SBI Agent Wesley Layton, Jr., qualified fingerprint expert, testified that the print on the driver's license was made by defendant's right index finger.

Carlene King testified that she was born and reared in Liberty, North Carolina, where the victims lived and the murders occurred; that she knew defendant by sight although she had not seen him in the last two or three years; that he was short, fat, and balding; that on the night of the murders she was walking down Highway 421 and passed through the Fogleman's yard; that she heard dogs barking and then heard one to three shots; that she feared the shots were directed at her and crouched down; that she saw and recognized Joel Stephens at the side of the house; that a light in front of the house was burning and it was a clear night; that defendant was "in a fast walk or run," took a few steps toward the woods and then turned back; that she "duck walked" to a ditch beside the highway and heard two to four more shots; that she left the area and, being afraid for her family who still lived in Liberty, told no one what she had seen and heard; that in July 1978 she saw defendant's picture in the paper

as the recipient of an award by the Jaycees and decided to notify the SBI because she felt it wasn't right for defendant to receive an award in light of what he had done. Mrs. King was sure she heard more than one shot the first time and more than two shots the second time.

Testimony of several officers indicated that on 5 April 1976, during their investigation of the murders, a light was in fact burning near the driveway of the Fogleman house. The light was strong enough to illuminate an area thirty to forty feet in diameter. One officer testified that the light was bright enough for him to recognize other officers going in and out of the house and around the house as he observed them from the highway.

Following a voir dire and denial of defendant's motion to suppress, SBI Agent Davenport testified, over objection, that defendant was fully advised of his constitutional rights, knowingly and understandingly signed a waiver and agreed to answer questions without the presence of an attorney. During that interrogation, which followed a polygraph test conducted with the consent of defendant and his attorney, defendant said he had no key to his grandparents' home and had not been there in three or four weeks preceding the murders; that if his fingerprints were found on Ethel Fogleman's wallet, someone must have planted them there "with a fingerprint glove"; that he did not kill his grandparents; that "if he did he did not remember it." When he was asked what should happen to whoever killed his grandparents, defendant replied that it would depend. He didn't think it should "mess up the person's life over one mistake."

Other evidence relevant to the questions raised on appeal will be narrated in the opinion.

Defendant offered no evidence.

The jury found defendant guilty of murder in the first degree in both cases, and he was sentenced to life imprisonment in each case. Defendant appealed to the Supreme Court assigning errors discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by Ben G. Irons II, Assistant Attorney General, for the State.*

*Bell and Browne, P.A., by Deane F. Bell and Charles T. Browne, Attorneys for defendant appellant.*

HUSKINS, Justice.

Defendant challenges the trial court's refusal to suppress certain incriminating statements defendant made immediately following a polygraph test administered to him by SBI Agent Steve Davenport. Admission of the statements constitutes defendant's fifteenth and sixteenth assignments of error. We first ascertain the factual basis for these assignments.

The record reveals that defendant and his attorney, William Heafner, were present in the SBI Office in Raleigh on 10 November 1976. Defendant said he was there "to take the polygraph examination." The SBI agent advised him of the following rights:

> "I fully realize that I am not required to take this examination. I may first consult with an attorney or anyone I wish before either signing this form or taking the examination. I have a right to remain silent the entire time I am here. Anything I may say can be used against me in a Court of Law. I have a right to talk to a lawyer for advice before answering any questions and to have him present during questioning. If I cannot afford an attorney and desire one, an attorney will be appointed for me before any questioning if I wish. If I decide to answer questions now without a lawyer present, I will still have the right to stop answering at any time. I also have the right to stop answering at any time until I have talked to a lawyer and I have the opportunity to exercise all of these rights at any time I wish during the entire time that I am here. Nevertheless, I voluntarily request and authorize Special Agent V. S. Davenport to now proceed with the examination."

Defendant signed a form acknowledging that he had read and understood his rights. He was not in custody at that time. Defendant was arrested for the murder of Mr. and Mrs. Fogleman on 16 August 1978.

Agent Davenport testified on voir dire in the absence of the jury that the polygraph examination "includes within it a phrase which is called testing. This is an instrumentation part. During that phase, there is no interrogation. It is strictly the asking of questions and taking the answers in which the person who is tak-

ing the examination gives it face value. Not challenging his answers at all. At the conclusion of all the testing, the instrumentation testing, if in my opinion, the person is lying then at that point the interrogration does start. And once the interrogation starts, the attorney does have a right to be there. His attorney was not allowed to be there during the test, but he was allowed [entitled] to be there during the interrogation."

In answer to certain questions propounded by the court, Mr. Davenport testified that one portion of defendant's statement was made during the "test phase" and another portion during "the interrogation." Continuing, Mr. Davenport said:

"Mr. Stephens' attorney was not present when I asked him about the fingerprints. I asked Mr Stephens what reason he could give for why his fingerprints had been found on his grandmother's wallet. I did not know the answer to the question of my own knowledge. Mr. Stephens' attorney was not present when this question was answered. His attorney could have been present if he had asked. When Mr. Heafner and Mr. Stephens arrived at the SBI office, I advised his attorney, Mr. Heafner, that he could not be present during the testing of Joel Dean Stephens. The question regarding fingerprints was not asked during the testing procedure. I did not specifically advise Mr. Heafner, Mr. Stephens' attorney, that he could be present during the interrogation. At the conclusion of the testing, I didn't leave the examination room. I do not know if anybody in law enforcement advised Mr. Stephens' attorney that he would be welcome to be with his client. I did not advise him that he could be present with Mr. Stephens at that time. . . . I went right from the testing into the questions. No one went outside and told Mr. Stephens' lawyer that he could come in when I was questioning Mr. Stephens. Mr. Stephens was advised of his rights and he signed the document prior to the testing stage. The rights contained a phrase that informed him that his attorney could be present during questioning. But I went right in from the polygraph test into the questioning. And Mr. Heafner, Mr. Stephens' attorney, was outside. Mr. Stephens was not advised at that time after the testing 'now at this point your attorney can be present.' Nor did I advise the attorney that he could come in to the room at that point. It would be reason-

able to believe that the attorney thought that I was conduct-
ing the polygraph portion of the test."

It thus appears from Mr. Davenport's testimony that At-
torney Heafner was told he had no right to be present during the
"test phase" of the polygraph examination, while defendant was
told that he was entitled to have his lawyer present during the in-
terrogation phase. Defendant was then taken into the testing
room while his attorney waited outside. Nobody advised either
defendant or his attorney when the testing phase ended and the
interrogation phase began. The State contends that defendant's
failure to demand the presence of his attorney and the attorney's
failure to enter the room when the testing phase had ended in-
dicates a recognition on their part that the presence of counsel
had been waived. Therefore, the State argues, the interrogation
was entirely proper and the incriminating answers elicited from
defendant were competent and properly admitted into evidence.
We now examine the challenged validity of the State's position.

[1,2]   We note initially that the results of a polygraph test are
not admissible in evidence to establish the guilt or innocence of
an accused. *See State v. Milano*, 297 N.C. 485, 256 S.E. 2d 154
(1979). Even so, the fact that defendant's incriminating statements
to SBI Agent Davenport were made *in the polygraph testing
room* is irrelevant on the question of their admissibility. *State v.
Carey*, 285 N.C. 509, 206 S.E. 2d 222 (1974). The challenged
statements were not the result of any polygraph test and, if
otherwise competent, were admissible.

The test of admissibility is whether the statements made by
defendant were in fact voluntarily and understandingly made.
*State v. Jones*, 278 N.C. 88, 178 S.E. 2d 820 (1971). Admissibility
depends upon whether the statement was freely and voluntarily
made and whether the officers who elicited the statement
employed appropriate procedural safeguards. *State v. Fox*, 274
N.C. 277, 163 S.E. 2d 492 (1968). A confession or incriminating
statement is voluntary in law when, and only when, it is in fact
voluntarily made. *State v. Vickers*, 274 N.C. 311, 163 S.E. 2d 481
(1968). The question of voluntariness must be determined by the
total circumstances of each particular case. *State v. Dawson*, 278
N.C. 351, 180 S.E. 2d 140 (1971). Although *Miranda* warnings are
required only when defendant is being subjected to *custodial* in-

terrogation, *State v. Sykes*, 285 N.C. 202, 203 S.E. 2d 849 (1974), and are not required during the investigatory stage when defendant is not in custody at the time he makes the statement, *State v. Meadows*, 272 N.C. 327, 158 S.E. 2d 638 (1968), all *involuntary* confessions or incriminating statements, made in custody or out, are ordinarily inadmissible for any purpose. *Mincey v. Arizona*, 437 U.S. 385, 57 L.Ed. 2d 290, 98 S.Ct. 2408 (1978); *State v. Richardson*, 295 N.C. 309, 245 S.E. 2d 754 (1978); *State v. Meadows, supra;* 2 Stansbury, North Carolina Evidence § 186 (Brandis rev. 1973). We now examine the admissibility of the challenged statements in light of these legal principles.

After defendant had been advised of his constitutional rights, his privilege against self-incrimination and his right to counsel could be waived provided the waiver was voluntarily, knowingly and intelligently made. If the totality of circumstances indicates that defendant was threatened, *tricked*, or cajoled into a waiver of his rights, his statements are rendered involuntary as a matter of law. "The totality of circumstances under which the statement is made should be considered when passing on admissibility." *State v. Steptoe*, 296 N.C. 711, 252 S.E. 2d 707 (1979).

[3] In the instant case the totality of circumstances indicates that, in effect, defendant was tricked or cajoled into waiving his right to counsel and his privilege against self-incrimination. Absent a knowing and intelligent waiver of these rights, defendant's statements cannot be considered to have been voluntarily made. Agent Davenport's testimony tends to show that he and others at SBI headquarters in Raleigh, in contradiction to the instructions Mr. Davenport had given defendant and his counsel regarding counsel's right to be present during interrogation, left defendant's attorney patiently waiting outside while Mr. Davenport went directly from the testing phase into the interrogation phase. Attorney Heafner could neither see nor hear what was transpiring. He thought the testing phase was still in progress. Defendant himself apparently assumed that his lawyer would be admitted to the room at the proper time. These circumstances impel the conclusion that defendant and his counsel were misled by a procedure which effectively breached rather than safeguarded the right to counsel and the privilege against self-incrimination. Essentially, defendant was advised of his rights and then adroitly prevented from asserting them by the procedures employed. It is

unrealistic to conclude that defendant's counsel accompanied him on a sixty-mile trip to the SBI Office in Raleigh for the mere purpose of sitting idly by while defendant, without consulting his attorney, knowingly waived counsel and made the challenged incriminating statements. Mr. Davenport's testimony on voir dire affirmatively demonstrates that defendant did not *voluntarily, knowingly* and *intelligently* waive his right to counsel during the interrogation here in question.

The evidence offered on voir dire in this case is insufficient to support the trial court's implicit finding and conclusion that defendant voluntarily, knowingly and intelligently *waived counsel* when he was *interrogated* by SBI Agent Davenport at SBI headquarters in Raleigh on 10 November 1976. The procedures used strongly suggest a denial of fundamental fairness. Those statements should have been suppressed. We cannot say there was no reasonable possibility that the statements contributed to defendant's conviction so as to bring them within the harmless error rule. *See Chapman v. California*, 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967); *State v. Taylor*, 280 N.C. 273, 185 S.E. 2d 677 (1972). In light of the circumstances under which the statements were obtained, their admission before the jury entitles defendant to a new trial.

We have carefully reviewed the remaining assignments of error and find no merit in any of them. Defendant's motion to suppress his in-court identification by the witness Carlene King was properly denied. *See State v. Montgomery*, 291 N.C. 235, 229 S.E. 2d 904 (1976). The testimony of SBI Agent Layton concerning defendant's fingerprint on Mrs. Fogleman's expired driver's license was properly admitted. Whether the print could have been impressed "only at the time of a crime" is a question for the jury and not for the court. *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977); *State v. Miller*, 289 N.C. 1, 220 S.E. 2d 572 (1975). The remaining assignments are either formal and require no discussion or are unlikely to arise on retrial.

For the reasons stated, defendant is awarded a

New trial.