STATE OF NORTH CAROLINA v. JOSEPH RALPH FRANKLIN

No. 446A82

(Filed 7 July 1983)

1. **Criminal Law § 75.11 — confession — previously invoking right to counsel in connection with other murders — voluntary waiver with respect to murder to which confessed**

   In a prosecution for first degree murder, the trial court properly found defendant's confession was voluntarily and understandingly made after he had been fully advised of his constitutional rights and had specifically, knowingly, and intelligently waived his right to remain silent and to have counsel present during questioning. Defendant had been represented by counsel on a plea to a charge of indecent exposure, and his counsel had orally and by letter informed the police department that defendant invoked his right to counsel concerning two murders about which police also wanted to question defendant. Approximately six months later when defendant was arrested on yet another unrelated matter, and police decided to renew efforts to question the defendant concerning the murders to which defendant had previously invoked his right to counsel, prior to any discussion, defendant waived his constitutional rights and indicated that he would answer questions without the presence of an attorney. When asked what he wanted to talk about, defendant began discussing not the two murders to which the police were ready to question him, but rather the murder with regard to the present prosecution.

2. **Constitutional Law § 43 — right to counsel prior to confession — critical stage of proceedings not reached**

   Although defendant was in custody on an unrelated robbery/rape charge, defendant's Sixth Amendment right to counsel did not arise prior to the time he made a statement about the murder in question on 9 October 1981. An arrest warrant was issued on that date and was executed on 10 October; defendant's first appearance before a judicial officer was on 15 October at which time counsel was appointed and a probable cause hearing was scheduled for 29 October. Defendant was indicted for the first degree murder in question on 26 October 1981. At no time prior to 15 October, when counsel for defendant was appointed, had the State committed itself to prosecute; therefore, defendant's Sixth Amendment right to counsel did not arise before that time.

3. **Homicide § 21.6 — felony murder — other than confession, absence of proof of underlying felony**

   Independent proof of the underlying felony in a felony murder prosecution is not necessary where a confession, otherwise corroborated as to the murder, includes sufficient facts to support the existence of the felony.

   Justice EXUM dissenting in part and concurring in part.

BEFORE *Snepp, J.*, at the 3 May 1982 Criminal Session of Superior Court, CALDWELL County, defendant was convicted of

first degree murder (felony murder) and first degree sexual offense. From a sentence of life imprisonment for first degree felony murder, judgment having been arrested on the first degree sexual offense conviction, defendant appeals as a matter of right, G.S. § 7A-27(a).

Claiming a violation of both his fifth and sixth amendment rights to counsel, defendant assigns as error the admission of his confession into evidence. Claiming that there was no evidence of the corpus delicti of the first degree sexual offense, defendant contends that the evidence was insufficient as a matter of law to prove this offense, and therefore, to prove the offense of first degree felony murder. We reject defendant's claims and affirm his conviction.

On 11 June 1980, the body of Michelle Moody, a fifteen year old girl, was discovered in a small clearing in a wooded area behind the Lenoir Shopping Mall. She was fully dressed. She had been stabbed twenty-three times. Approximately sixteen months later, on 9 October 1981, after being advised of his rights, the defendant gave the following statement to law enforcement officers:

About June or July 1980 I met Michelle Moody at about 7:30 P.M. at the Lenoir Mall—this was at the rear of the mall. I had never met this girl before. I ask her if she wanted to smoke a joint. She said yes—we walked down into some nearby woods—when we got down to the woods we smoked a joint—I pulled my knife out, put my left arm around her throat and placed the knife which was in my right hand, against her stomach—I was behind her as we walked further down into the woods—we walked for about a 100 yards and stopped. It was my intentions to rape Michelle. I took her upper clothing off first and played around with her breast. I then took the rest of her clothes off—I started to enter her with my penis but Michelle kept talking to me about not coming in her; that she had enough problems as it was and she didn't want to get pregnant. This was when I told her to give me a blow job—She gave me a blow job and I reached a climax in her mouth—I put my clothes on first & I told her to put her clothes on. She put her clothes back on—I was thinking about running at this time—We heard some children or

something walking in the woods — I did see (2) young boys walking nearby earlier as Michelle was giving me a blow job — I didn't see them this 2nd time but I heard them — Michelle screamed and I grabbed her and started stabbing her several times. She was standing up when I first stabbed her and I stabbed her some more after she fell — I stabbed her until she quit moving — I looked around to see if I was leaving anything. I lost my cigarette lighter at this time — I used my hunting knife to stab her — I took my knife to Donald Maxon and he cleaned my knife for me. I wiped some of the blood off and, what blood was left on the knife looked like rust. I was going to take the knife to work and press it into some boards, but I lost it somewhere prior to doing this. I got some blood on my overalls and I took a cigarette and burned holes in my clothes where the blood was — Lenoir took the overalls from me — the above is the truth to the best of my knowledge —

Defendant was again questioned on 10 October 1981. He was fully advised of his constitutional rights and signed a written waiver. The result of this questioning was a second confession, consistent with the first although in more detail. On 13 October 1981 defendant gave a third statement which was recorded, again consistent with the others and with additional detail and again following a waiver of his rights. Finally, on 14 October 1981, defendant was taken to the Lenoir Mall to stage a videotaped re-enactment of the crime. He was again advised of his constitutional rights and signed another written waiver. He was orally advised that he could refuse to participate in the videotaped re-enactment.

Evidence at trial tending to corroborate defendant's confessions included the following: (1) Virginia Burgess testified that she saw the defendant running from the Lenoir Mall about 8:45 or 9:00 p.m. on the night of the murder. (2) Donald Maxon testified that defendant had asked him to clean a knife which had rust-like stains on it. (3) A cigarette lighter was found near the victim's body. The victim's stepfather testified that he knew the defendant from their employment at the same company. Sometime after 11 June 1980, defendant called to say that because the police had found his cigarette lighter behind the mall, they were trying to charge him with Michelle's murder. (4) It also appears that the

State had possession of defendant's overalls on which there remained a stain that had not been burned. However, there was no direct testimony to this effect at trial.

*Rufus L. Edmisten, Attorney General, by Myron C. Banks, Special Deputy Attorney General, for the State.*

*Ann B. Petersen, Assistant Appellate Defender, Office of Appellate Defender, for defendant-appellant.*

MEYER, Justice.

[1] Defendant contends that his written and recorded confessions were obtained in violation of his fifth amendment right against self-incrimination and his sixth amendment right to counsel. He bases his argument on the following facts:

In March 1981, defendant had been represented by Assistant Public Defender Lyle Yurko on a plea to a charge of indecent exposure. At that time, defendant was also a suspect in the Mecklenburg County murders of Amanda Ray and Nealy Smith, two young children. The Charlotte police department contacted Mr. Yurko subsequent to defendant's sentencing on the charge of indecent exposure. It was the intent of Charlotte police officers Kirshner and Parker to question defendant concerning the Ray and Smith murders. Presumably pursuant to G.S. § 7A-452(a), Mr. Yurko undertook to represent defendant with respect to police efforts to question defendant concerning these murders. Defendant invoked his right to counsel and the Charlotte police were so informed by Mr. Yurko orally and by letter to the district attorney dated 28 April 1981.

On 8 October 1981, defendant was arrested on yet another unrelated matter in Mecklenburg County. He was charged with rape, kidnapping and robbery and apparently confessed to those crimes. In light of these developments, Charlotte Police Officer Styron determined to renew efforts to question the defendant concerning the Ray and Smith murders. This was the purpose of the 9 October meeting with the defendant. Officer Styron met with defendant at the Mecklenburg County Jail. Prior to any discussion, defendant waived his constitutional rights and indicated that he would answer questions without the presence of an attorney. Officer Styron was not aware that defendant had

earlier requested the presence of counsel during questioning on the Ray and Smith murders. He began the conversation on a sympathetic note, acknowledging defendant's "predicament" arising out of the rape/robbery arrest, his problems with sexual violations involving young children, and his need for psychological treatment. No mention was made of the Ray or Smith murders. Defendant then requested that he be taken "downtown." Officer Styron asked defendant if he wanted "to talk about these cases," and defendant answered yes. At the Law Enforcement Center, defendant was again advised of his rights by Officer Price. When asked what he wanted to talk about, defendant began discussing not the Ray and Smith murders, but rather the murder of Michelle Moody in Lenoir.

With respect to his fifth amendment right, defendant argues that

> once he formally invoked his right to be free from interrogation on the Smith and Ray cases without the presence of counsel, he could not lawfully be interrogated on those matters again in a police initiated encounter. When Officer Styron initiated the encounter on October 9, he violated the defendant's Fifth Amendment right to counsel and the confession in the Moody case that resulted was inadmissible. All of the subsequent confessions obtained from the defendant by officers of the Lenoir Police Department and the SBI agent were fruits of the poisoned tree of the first confession.

It is true that under *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378 (1981), once a suspected criminal invokes his right to counsel, he may not be questioned further until counsel is provided unless the suspected criminal himself initiates the dialogue at which time he may waive his right to have an attorney present. However, in the case sub judice, defendant had never invoked his right to counsel with respect to the Moody murder. He specifically stated, prior to any questioning, that he just wanted "to go ahead and get this over with. I do not want a lawyer." Officer Price further testified on voir dire that he told defendant for his best interest he ought to obtain a lawyer before trial.

We do not decide whether Officers Styron and Price, in good faith, might properly have initiated questioning concerning the Ray and Smith murders in light of defendant's earlier request

that he have an attorney present during questioning on these cases; nor do we decide whether the officers might properly have initiated questioning concerning the Moody murder.[1] These issues aside, we are left with defendant's completely unsolicited confession to a murder about which there had never been any intention to question him.

Prior to the 9 October questioning, defendant was fully advised of his constitutional rights to remain silent and to have counsel present during questioning. We attach no significance to the fact that the officers "did not expand on the defendant's rights or explain them beyond what appeared on the standard *Miranda* rights card that he read from." Nor do we find it significant that the defendant was questioned in a "small, windowless interrogation room." There is no evidence that there were promises given, threats made, or that the confession was coerced or in any way improperly induced. The defendant simply waived his rights and chose to cooperate with the law enforcement authorities. This the law permitted him to do.

It is not the purpose of the fifth amendment constitutional protections to discourage confessions, nor to impede the authorized role of our law enforcement agencies to bring criminals to justice. As Chief Justice Warren stated in *Miranda*, "[c]onfessions remain a proper element in law enforcement." *Miranda v. Arizona*, 384 U.S. at 478, 16 L.Ed. 2d at 726. We therefore hold that under the facts of this case, defendant's confessions were voluntarily and understandingly made after he had been fully advised of his constitutional rights and had specifically, knowingly, and intelligently waived his right to remain silent and to have counsel present during questioning.

[2] Defendant's sixth amendment argument presumes that his "Sixth Amendment right to counsel arose prior to the 9 October statement" because defendant was in custody on an unrelated robbery/rape charge. With respect to the robbery/rape charge,

---

1. The United States Supreme Court has most recently admitted the possibility of a good faith exception to the exclusionary rule in *Illinois v. Gates*, --- U.S. ---, --- L.Ed. 2d --- (1983). North Carolina's statutory codification of the exclusionary rule would permit such an exception. *See* G.S. § 15A-974(2)(b) and (c). We also find the case of *United States ex rel. Karr v. Wolff*, 556 F. Supp. 760 (N.D. Ill., E.D. 1983) inapposite. In that case defendant invoked his right to counsel in one case after which officers initiated questioning concerning an unrelated case.

the record does not disclose, nor do we find it relevant, whether formal charges had been instituted in this case. At issue is whether defendant's sixth amendment right to counsel in the Moody murder had attached. We hold that it had not. Prior to the 9 October statement, defendant was no more than a suspect in the Moody murder. Investigation had not yet reached the accusatory stage and had certainly not reached the point where adversary judicial proceedings had been initiated in that case. *See Kirby v. Illinois*, 406 U.S. 682, 32 L.Ed. 2d 411 (1972).

In the alternative, defendant claims that his sixth amendment right to counsel arose in the Moody case after his 9 October statement, thus rendering all subsequent statements against him inadmissible. We do not agree.

The record discloses that an arrest warrant was issued in the Moody murder case on 9 October 1981 and was executed on 10 October. Defendant's first appearance before a judicial officer was on 15 October 1981, the day after he agreed to the videotaped re-enactment of the crime. Counsel was appointed at this time and a probable cause hearing was scheduled for 29 October 1981. Defendant was indicted for the first degree murder of Michelle Moody at the 26 October 1981 session of Superior Court, Caldwell County. On 18 January 1982, defendant was indicted on the first degree sex offense charge.

It is well-settled that a criminal defendant's sixth amendment right to counsel attaches only at such time as adversary judicial proceedings have been instituted "whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois*, 406 U.S. at 689, 32 L.Ed. 2d at 417. In *State v. McDowell*, 301 N.C. 279, 289, 271 S.E. 2d 286, 293 (1980), *cert. denied*, 450 U.S. 1025 (1981), *reh. denied*, 451 U.S. 1012 (1981), this Court, while finding that the ivestigation "had narrowed its focus upon [the defendant], it had not so progressed that the state had committed itself to prosecute. It is only when the defendant finds himself confronted with the prosecutorial resources of the state arrayed against him and immersed in the complexities of a formal criminal prosecution that the sixth amendment right to counsel is triggered as a guarantee."

In the present case, following the 9 October statement, investigation into the Moody murder had "narrowed its focus" upon

the defendant. Investigation continued through 14 October, the date of defendant's last statement. On 15 October counsel was appointed for the defendant.[2]

We therefore hold that at no time prior to 15 October, when counsel for defendant was appointed, had the State committed itself to prosecute. *See Tarpley v. Estelle*, 703 F. 2d 157 (5th Cir. 1983) (neither defendant's arrest nor appearances before a magistrate triggered the defendant's sixth amendment right to counsel as no adversary judicial proceedings were commenced prior to the return of the indictment).[3]

---

2. We further note that even had defendant retained counsel in the face of investigation into the Moody murder, his sixth amendment *right* to counsel would not have *attached* until adversary judicial proceedings had been instituted against him. A sixth amendment right to counsel is to be viewed "in the context of whether the claimed violation occurred in a critical stage of a prosecution, . . ." *United States v. Craig*, 573 F. 2d 455 (7th Cir. 1977), *cert. denied*, 439 U.S. 820 (1978) n. 14.

3. *See also* Kamisar, *Brewer v. Williams, Massiah*, and *Miranda*: What is "Interrogation"? When Does It Matter? 67 Geo. L.J. 1 (1978), in which the author notes that "The [United States Supreme] Court has extended the sixth amendment right to counsel, as opposed to the *Miranda* right, backwards from the trial through the indictment to the initiation of judicial proceedings, presumably the first appearance before a judicial officer" and "the Court is unlikely to extend the right any further." *Id.* at 83. The United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966), reaffirmed the principle that suspects *under interrogation* are entitled to the assistance of counsel, earlier enunciated in *Escobedo v. Illinois*, 378 U.S. 478, 12 L.Ed. 2d 977 (1964). However, *Miranda* effectively displaced *Escobedo's* sixth amendment rationale by assigning the privilege to a newly created fifth amendment right to counsel rather than to the right to counsel secured by the sixth amendment. In *North Carolina v. Butler*, 441 U.S. 369, 60 L.Ed. 2d 286 (1979), the Supreme Court made it clear that a suspect may waive his fifth amendment right to counsel, as did the defendant in the case sub judice, following an express indication of a desire to waive the *Miranda* rights. It is also interesting to note in a historical context that the *Miranda* court, in resolving the right to counsel question in the context of custodial interrogation, cited, at page 440 of the opinion, to Enker and Elsen, Counsel for the Suspect: *Massiah v. United States* and *Escobedo v. Illinois*, 49 Minn. L. Rev. 47 (1964). In that article, the authors wrote: "[T]he presence of counsel at this point may very well result in the suppression of truth rather than its disclosure. This is because counsel, aware of the significance which an accused's admissions may have in building the prosecution's case, would normally tell his client to remain silent as a tactical decision. As a result, not only will coerced confessions be eliminated, but so will voluntary ones which will generally contain the truth. The accused's power is increased, but at the expense of the search for truth. . . . The right to counsel, then, to the extent that it is more than an expensive prophylactic rule designed to protect against coercion, serves to protect no interest than to make prosecution of the guilty more difficult." *Id.* at 66-67. In so creating a fifth amendment right to counsel, the Supreme Court

[3] As his second assignment of error, defendant contends that the evidence is insufficient as a matter of law to support his conviction of felony murder. As a basis for this argument he states that apart from his extrajudicial confession, there was no evidence of the corpus delicti of first degree sexual offense, the underlying felony upon which the murder conviction was based.

As recently as *State v. Brown*, --- N.C. ---, ---, --- S.E. 2d ---, --- (1983), we stated that "[i]n North Carolina, 'a conviction cannot be sustained upon a naked extrajudicial confession. There must be independent proof, either direct or circumstantial, of the *corpus delicti* in order for the conviction to be sustained.' *State v. Green*, 295 N.C. 244, 248, 244 S.E. 2d 369, 371 (1978); *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975)." In his treatise on evidence, Wigmore offers the following insights into the corpus delicti rule:

> The meaning of the phrase *corpus delicti* has been the subject of much loose judicial comment, and an apparent sanction has often been given to an unjustifiably broad meaning. It is clear that an analysis of every crime, with reference to this element of it, reveals three component parts, *first*, the *occurrence* of the specific kind of injury or loss (as, in homicide, a person deceased; in arson, a house burnt; in larceny, property missing); *second*, somebody's criminality (in contrast, e.g., to accident) as the source of the loss—these two together involving the commission of a crime by *somebody*; and, *third*, the accused's *identity* as the doer of this crime.

7 Wigmore on Evidence, § 2072 (Chadbourn rev. 1978). He notes that "the term *corpus delicti* seems in its orthodox sense to signify merely the first of these elements," "[b]ut by most judges the term is made to include the second element also, i.e., somebody's criminality," while the third view is "too absurd indeed to be argued with. . . ." *Id.*

---

appeared to strike a balance between the need to protect a criminal defendant from the coercive aspects of custodial interrogation and the legitimate interest of the State in pursuing its investigations.

Although the rule is applied in varying degrees in different jurisdictions,[4] North Carolina has traditionally required corroborative evidence of both the first and second of the components under Wigmore's definition; that is, the occurrence of the specific kind of injury or loss and somebody's criminality as the source of the loss. *See State v. Dawson*, 278 N.C. 351, 180 S.E. 2d 140 (1971).[5]

Debate as to the degee of corroboration necessary to satisfy the requirements of the corpus delicti rule has centered on two questions: whether corroboration is necessary for all elements established by the confession and whether the corroborating facts may be of any sort whatever, provided only that they tend to produce confidence in the truth of the confession. These questions were addressed by the United States Supreme Court in *Smith v. United States*, 348 U.S. 147, 156, 99 L.Ed. 192, 200-201 (1954), and were answered as follows:

> All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused.

*See Opper v. United States*, 348 U.S. 84, 99 L.Ed. 101 (1954); *see also Landsdown v. United States*, 348 F. 2d 405 (5th Cir. 1965).

In the present case, defendant argues that because the State allegedly failed to produce sufficient corroborative evidence of the corpus delicti of the underlying felony, a first degree sexual offense, the evidence was insufficient as a matter of law to sup-

---

4. *e.g.* Corroboration is not necessary in Massachusetts. *Commonwealth v. Kimball,* 321 Mass. 290, 73 N.E. 2d 468 (1947) (conviction for indecent assault based solely on confession upheld). Florida, on the other extreme, requires independent proof of the accused's identity as the doer of the crime. *Jefferson v. State*, 128 So. 2d 132 (Fla. 1961).

5. Our traditional definition of corpus delicti in a homicide case is (1) the death of a human being (2) by criminal means. As stated by Justice Huskins in *Dawson*: "(1) There must be a corpse, or circumstantial evidence so strong and cogent that there can be no doubt of the death, *State v. Williams, supra* [52 N.C. 446, 78 Am. Dec. 248 (1860)]; and (2) the criminal agency must be shown. *State v. Minton*, 234 N.C. 716, 68 S.E. 2d 844, 31 A.L.R. 2d 682 (1952). 'The independent evidence must tend to point to some reason for the loss of life other than natural causes, suicide or accident.' Rollin M. Perkins, The Corpus Delicti of Murder, 48 Va. L. Rev. 173 (1962)."

port his conviction of felony murder. Thus presented, the question is one of first impression in our State and depends for its resolution on an analysis of the corpus delicti rule including the underlying purposes and policies of the rule, as it applies to our statutory definition of first degree murder under G.S. § 14-17. That statute provides in pertinent part:

> A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree, . . . .

Thus, G.S. § 14-17 separates first degree murder into four distinct classes as determined by the proof. *See State v. Strickland,* 307 N.C. 274, 298 S.E. 2d 645 (1983). Whether the murder involves lying in wait, premeditation, rape, arson or the other felonies specified is not the determinative factor in applying the corpus delicti rule. The corpus delicti is established by evidence of the death of a human being by criminal means independent of the confession from which inferences may be drawn that it was feloniously done, without evidence independent of the confession as to the specific class of murder.

We find support for our position in numerous federal court cases which, as noted earlier, permit merely corroborating evidence independent of the confession to be sufficient, if it tends to establish the trustworthiness of the confession. In the present case, defendant does not question the corpus delicti of the murder. Here the corroborating evidence establishes that the victim was found stabbed to death in a wooded area near the Lenoir Mall on 11 June 1982; she was last seen about 8:20 or 8:30 p.m. at the mall on 10 June; a cigarette lighter was found near her body; a witness saw defendant running from the mall between 8:45 and 9:00 p.m. on the night of the murder; and defendant asked another witness to clean his knife which had rust-like stains on it. Thus, the corpus delicti of the murder was shown here by evidence *aliunde* the confession.

The corpus delicti rule is based on the hesitancy of the law to accept, without adequate corroboration, the extrajudicial confession of a defendant and to avoid convicting a person, solely out of his own mouth, of a crime that was never committed or was committed by someone else. Where there is proof of facts and circumstances which add credibility to the confession and generate a belief in its trustworthiness, and where there is independent proof of death, injury, or damage, as the case may require, by criminal means, these concerns vanish and the rule has served its purpose. Elements of the offense may then be proved through the statements of the accused.

Further support for our position comes from other jurisdictions which have addressed this issue. In *State v. Johnson*, 31 N.J. 489, 158 A. 2d 11 (1960), *cert. denied*, 368 U.S. 933, the court held that the state was required to prove only the element of death and could rely on the confession of the defendant to prove the underlying felony of attempted robbery. The court wrote that:

> In a prosecution for felony-murder, proof of the felony replaces proof of the mental elements necessary for conviction of willful, deliberate and premeditated killing. In a prosecution for premeditated murder, the State is not required independently to prove those mental elements if the defendant has given a confession that admits them. By the same token, independent proof of the felony in a felony-murder prosecution is not necessary if proof of the felony can be gathered from a corroborated confession. In our view the State satisfied the burden placed upon it by independently proving the fact of death, and by producing corroborative evidence tending to establish that when the defendants confessed that they participated in the holdup and killing they were telling the truth. We therefore find that the confessions were properly received in evidence and were amply corroborated.

*Id.* at 505, 158 A. 2d at 19-20. *See Gentry v. State*, 416 So. 2d 650 (Miss. 1982); *Rhone v. State*, 254 So. 2d 750 (Miss. 1971); *see also Jones v. State*, 253 Ind. 235, 252 N.E. 2d 572 (1969), *cert. denied*, 431 U.S. 971 (1977).

We therefore hold that independent proof of the underlying felony in a felony murder prosecution is not necessary where a

confession, otherwise corroborated as to the murder, includes sufficient facts to support the existence of the felony. It was proper to show solely by defendant's confession that the homicide was murder in the *first* degree by showing that the murder was committed in the perpetration of another felony.

Finally, defendant argues that the court erred in permitting the State to ask prospective jurors death qualifying questions, thereby violating his right to an impartial jury and a fair trial. Defendant concedes that this Court decided the issue against him in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980), and most recently affirmed its decision in *State v. Hill*, --- N.C. ---, --- S.E. 2d --- (filed 5/3/1983). Defendant, nevertheless, requests the Court to re-examine its holdings in these cases. As we stated in *Hill*, "we determine that the prior decisions of this Court previously referred to are sound and should be viewed as binding precedent controlling on the issues raised by the defendant appellant." *Id.* at ---, --- S.E. 2d at ---.

No error.

Justice EXUM dissenting in part and concurring in part.

I dissent from the part of the majority's opinion in which it concludes defendant's confession was not obtained in violation of defendant's Fifth and Fourteenth Amendment rights to counsel and to remain silent.

The pertinent facts as found by the trial judge are as follows:

2. In January, 1981, the defendant was charged in Mecklenburg County with taking indecent liberties with a minor and with indecent exposure. The Public Defender's office of Mecklenburg County was appointed by the Court to represent him in those cases which were assigned to Lyle Yurko, then an Assistant Public Defender. These cases were finally concluded March 19, 1981.

3. Sometime before the representation of the defendant by the Mecklenburg Public Defender in those cases ended Officer Kirshner of the Charlotte Police Department talked with Mr. Yurko and told him that the defendant was a suspect in the Smith and Ray cases, which were unsolved

homicides occurring in Mecklenburg County, and was also a suspect in a case in Caldwell County. The Officer asked Mr. Yurko if the defendant was willing to be interrogated about the Smith and Ray cases. There were no charges pending against the defendant in connection with those cases in Mecklenburg County at that time. Mr. Yurko then conferred with Mr. Fritz Mercer, the Public Defender for Mecklenburg County, concerning the matter. Mr. Mercer, without any Court order appointing his office to represent the defendant as to the Smith and Ray cases as required by G.S. 7A-452, nonetheless authorized Mr. Yurko to act as the defendant's attorney as to the Smith and Ray matters.

4. Mr. Yurko then conferred with the defendant who was apparently serving a sentence in the Mecklenburg County jail at the time. *The defendant advised Mr. Yurko that he had been questioned by the police about these cases and did not want to answer any further questions concerning them. Mr. Yurko informed Officer Kirshner of this.* Mr. Yurko had no further contact with the defendant concerning these matters until the time he left the Mecklenburg Public Defender's office on June 30, 1981, to enter private practice. *However, sometime prior to April 28, 1981, Mr. Yurko learned through the news media that the defendant may have been again interrogated by police officers as to the Smith and Ray matters. On April 28, 1981, he wrote a letter to the District Attorney of the Twenty-sixth Judicial District advising him that Mr. Franklin did wish to have an attorney and requesting that if such questioning was desired the Public Defender's office be contacted. A copy of this letter was sent to the Chief of the Charlotte Police Department and the Chief of the Mecklenburg County Police Department.*[1]

5. On October 9, 1981, the defendant was in custody in Mecklenburg County on charges arising there, and unrelated to the instant case or to the Smith and Ray cases. On that date Officer J. F. Styron of the Mecklenburg County Police

---

1. In a cover letter sent to the Chief of the Charlotte Police Department Mr. Yurko requested that the officers investigating the Smith and Ray murders be given the information that defendant did not want to be questioned without an attorney present. Apparently this was not done since Officer Styron testified he had no actual knowledge of defendant's invocation of his right to silence.

Department, who had on occasions in March, 1981, talked with the defendant concerning the Smith and Ray cases, learned that the defendant was in custody and went to the jail to talk to him about them. Officer Styron knew that the defendant had been a suspect in the instant case, but his sole purpose in going to the jail was to talk to the defendant about the Smith and Ray cases. Officer Styron at the time did not have actual knowledge of the notice given by Mr. Yurko as to the Public Defender's representation of the defendant in the Ray and Smith cases.

6. *At the Mecklenburg County jail Officer Styron advised the defendant that he wanted to talk to him about the Smith and Ray cases.* He then orally advised the defendant that he had a right to remain silent; that anything he said could and would be used against him in court; that he had the right to talk to a lawyer and have him present while being questioned; that if he could not afford to hire a lawyer one would be appointed to represent him before any questioning if he wished one. After the warning the defendant stated that he understood these rights and that he was willing to talk to Officer Styron without an attorney. Thereafter the defendant talked to Officer Styron about the problems as a result of which he was then in custody, about prior sexual offenses for which he had served time in prison, and complained that he had never received any treatment for his problem. The defendant then asked Officer Styron to take him to the police offices. Officer Styron asked him if he wanted to talk about the cases, and the defendant replied that he did.

7. Later in the day the defendant was taken from the Mecklenburg County jail by Officer S. L. Price of the Mecklenburg Police Department to the Charlotte Law Enforcement Center. There Officer Price, in the presence of Officer Styron, in writing and orally advised the defendant that he had a right to remain silent and make no statements; that any statement he made could and would be used as evidence against him; that he had a right to have an attorney present to advise and counsel him at that time; that if he could not afford to hire an attorney one would be provided for him at no cost; that if at any time he should desire to stop making any statement or wish to contact an attorney he would be al-

lowed to do so at once. Officer Price read these rights to the defendant from a printed form, which the defendant followed. The defendant, in writing, stated that he did not wish to have an attorney present; that he was 23 years of age, had attained the 12th grade in school; that he had read the waiver, and having been informed verbally and in writing of his rights and understanding that he could exercise them at any time waived his rights and agreed to answer any questions asked.

8. Immediately after the execution of the waiver form Officer Price asked the defendant what he wanted to talk about. The defendant immediately began to talk about the killing of a girl named Michelle in Lenoir. He stated to the officers that he wanted to get it over with and did not want a lawyer.

9. The information given to Officers Price and Styron on this occasion was reduced to writing and signed by the defendant. [Emphasis added.]

Following his initial confession to the Mecklenburg County officers, defendant was questioned on the same day at the Charlotte law enforcement center by two officers from the Lenoir Police Department. Defendant was given his *Miranda* warnings by the Lenoir officers. Then the officers went over the statement defendant had given about the instant case to Officers Styron and Price, eliciting additional details about the incident. The next day, 10 October 1981, defendant was questioned by an SBI agent who had read the statement given by defendant to the Lenoir police officers and was accompanied during the interview by a Lenoir police officer. On 13 October defendant was brought to the Lenoir Police Department where he was interviewed by an assistant district attorney. The interview was recorded after defendant said he did not object. Finally, on 14 October defendant was taken to the Lenoir Mall by Lenoir police officers where he reenacted for videotaping the events to which he had confessed.

Thus, defendant, had, through his attorney,[2] expressed in writing his desire to deal with police only through counsel in

---

2. Whether or not Mr. Yurko had the statutory authority to represent defendant to the limited extent he did in the Smith and Ray cases is not a relevant ques-

responding to any questioning about the Ray and Smith murders. The police, not defendant, initiated contact with him for the purpose of questioning him about the Smith and Ray cases. Officer Styron told defendant he wanted to discuss the Smith and Ray murders, then he informed him of his *Miranda [v. Arizona,* 384 U.S. 436 (1966)] rights. A general conversation was held about defendant's problem with committing various sex offenses and the lack of treatment afforded him for his problem. Defendant then requested to be taken from jail to the police headquarters. Styron believed defendant was going to talk about the Smith and Ray cases, but after executing a waiver form at the police offices he began to talk about the killing of a girl named Michelle in Lenoir.

The majority states: "It is true that under *Edwards v. Arizona,* 451 U.S. 477, 68 L.Ed. 2d 378 (1981), once a suspected criminal invokes his right to counsel, he may not be questioned further until counsel is provided unless the suspected criminal himself initiates the dialogue at which time he may waive his right to have an attorney present." I agree with the majority's interpretation of *Edwards.* The United States Supreme Court clearly stated:

> (A)lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina v. Butler* [441 U.S. 369, 372-76 (1979)], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made*

---

tion in the instant case. As the trial court stated at the suppression hearing, "The evidence is uncontradicted in writing the Police had been notified, whatever the legalities of the appointment, that the defendant invoked his right to remain silent with regard to the Ray and Smith cases, and no interrogation as to those matters were to be carried on by any law enforcement agency in Mecklenburg without the presence of defendant's counsel."

*available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.*
451 U.S. at 484-85 (footnote omitted) (emphasis added). The holding in *Edwards* has subsequently been characterized by the Supreme Court as a "prophylactic rule" requiring "that before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the 'suspect himself initiates dialogue with the authorities.'" *Oregon v. Bradshaw*, --- U.S. ---, 51 U.S.L.W. 4940 (U.S. June 23, 1983) (No. 81-1857) (quoting *Wyrick v. Fields*, --- U.S. ---, --- (1982) (*per curiam*)).

Yet the majority, while recognizing the holding in *Edwards*, ignores it in its analysis of the instant case. It begs the question when it states "defendant had never invoked his right to counsel with respect to the Moody murder." The majority states, "We do not decide whether Officers Styron and Price, in good faith, might properly have initiated questioning concerning the Ray and Smith murders in light of defendant's earlier request that he have an attorney present during questioning on these cases . . . ."

But this is precisely the question which must be decided. The *Edwards* Court excluded the defendant's confession to robbery, burglary and first degree murder because his statements were "the fruits" of an interrogation initiated by the police after he had "clearly asserted his right to counsel." 451 U.S. at 485. In *Miranda* the Court had stated: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." 384 U.S. at 474. The Court in *Edwards* built on the statement in *Miranda* that "interrogation must cease until an attorney is present," in holding that defendant could not be reinterrogated once he had asserted his right to counsel. Thus, *Edwards* holds that it is impermissible for the police to initiate a meeting with a defendant to discuss a crime for which he has invoked his right to counsel unless counsel has been made available to him. If the police do initiate such a "meeting," "interrogation," "conversation" or "exchange," then any statements which result from such an impermissible contact must be excluded.

The holding in *Edwards* compels the conclusion that Officers Styron and Price could not have properly initiated questioning

about the Smith and Ray murders, as they did, in light of defendant's express request that an attorney be present during any further questioning about those murders. Had defendant confessed to the Smith and Ray murders to the officers, his confession would have been inadmissible under *Edwards*. That defendant confessed to a murder other than the ones Styron, and later Price, had in mind does not alter the character of Styron's initial contact. That contact was impermissible under *Edwards*.

In addition, defendant's subsequent confessions to the Lenoir officers, the SBI agent, and the assistant district attorney were also inadmissible exploitations of his initial confession. When the *Edwards* Court used the phrase "the fruits of the interrogation," it alluded to a principle most memorably set forth in *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). The *Wong Sun* Court excluded verbal statements made by defendant Toy immediately after an illegal entry and arrest by narcotics officers. Narcotics obtained from defendant Yee pursuant to Toy's illegally-obtained statements were also excluded as "fruit of the poisonous tree" because the "taint" of the original illegal police action had not been purged. 371 U.S. at 487-88.

In the instant case the taint of the police-initiated interrogation[3] was not removed by defendant's being taken at his request from jail to police headquarters where he confessed not to the Smith and Ray murders but to the Moody murder. Defendant's confession was in direct response to and the result of the contact impermissibly initiated by Styron at the jail and followed up by

---

3. In both *Miranda v. Arizona, supra*, 384 U.S. at 450, and *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980), the Supreme Court has recognized that "interrogation" does not mean only "express questioning." Rather, "techniques of persuasion" such as blaming society for the defendant's behavior amount to interrogation when employed "in a custodial setting." The test enunciated in *Innis* for determining whether interrogation has occurred is whether the words or actions of the police are such that "the police should know [they] are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301 (footnotes omitted). In the instant case Officer Styron told defendant while defendant was in jail that he wanted to talk about the Smith and Ray cases, read defendant his rights, and then discussed with him defendant's psychological problems and the failure of the prison system to provide him with treatment for the problem. Officer Styron also testified he could tell defendant was depressed throughout the time he gave the statement and periodically would become very emotional. Thus, it is difficult to characterize Styron's initial conversation with defendant as anything other than an interrogation.

Price at police headquarters. It was not "completely unsolicited," a characterization given it by the majority.

Furthermore, there is no "good faith" exception to the *Edwards* holding. The officers who questioned Edwards had no actual knowledge that he had invoked his right to counsel,[4] just as Officer Styron had no actual knowledge in the instant case.

I do not reach the question of whether defendant's right to counsel under the Sixth Amendment had been violated because I believe the confession must be excluded under *Edwards* and *Miranda*.

I also dissent from the majority's conclusion that no error was committed in death qualifying the jury for the reasons stated in my dissent in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980).

I concur in the majority's treatment of the corpus delicti issue.

———————————

4. It is unclear frm the United States Supreme Court opinion whether the interrogating officers knew of Edwards' previous assertion of his right to counsel. However, the Court expressly stated that it primarily relied upon the statement of facts set forth in the Arizona Supreme Court's opinion in developing its own statement of the facts. 451 U.S. at 478, n. 1. In the state court's opinion it is clear that the officers had no actual knowledge Edwards had requested an attorney. 122 Ariz. 206, 209, 594 P. 2d 72, 75 (1979).