STATE OF NORTH CAROLINA v. GROVER FRANKLIN BAUGUSS

No. 554A82

(Filed 2 February 1984)

1. **Criminal Law § 75.8— no relation between possibly tainted statement and two
   subsequent admissions**

   In a prosecution for murder, there was nothing in the record which sup-
   ported a finding that a statement to an officer who administered a polygraph
   test either tainted or bore any relation to two subsequent statements made to
   two other officers where neither the State nor the defendant included a

substantive account of the admission made to the polygraph operator; the polygraph statement was not introduced at trial and used against defendant; and there was no showing that the statement was inculpatory. Further, assuming defendant did make an incriminating admission, there was no evidence presented to indicate that the admission was consistent with the subsequent statements.

**2. Criminal Law § 75.11— attorney's representation of defendant on other charges—waiver of attorney for present charges**

An attorney could not validly assert the defendant's Fifth and Sixth Amendment rights with regard to charges on which he did not represent the defendant, and defendant could validly waive the services of an attorney on the charges even though his attorney for the other charges told the sheriff that he did not want anyone talking to the defendant unless he, the attorney, was notified.

Justice EXUM dissenting.

APPEAL by defendant as a matter of right from the judgment of *Rousseau, J.,* entered at the 3 May 1983 Criminal Session, WILKES County Superior Court. Defendant was charged in indictments, proper in form, with first degree murder and armed robbery. The jury returned a verdict of guilty of first degree murder in the perpetration of a felony and Judge Rousseau imposed a sentence of life imprisonment.

In relevant part, the evidence for the State tended to show the following: On 30 December 1981, the deceased, Mark Absher, was working at Groce's Store in Wilkesboro, North Carolina. Between 9:45 and 10:00 a.m. on that day, William J. Howell, Jr. drove by the store and noticed a small blue foreign economy car parked at the gas pumps in front of the store. He returned to the store to buy gasoline approximately fifteen minutes later. The blue car was still parked in front of the store. Howell waited in his car for the car owner to return and move the car so he could drive closer to the gasoline pump. After about thirty seconds, Howell observed a man, whom he later identified as the defendant, walk from the store to the car. The person got in the car and left in a normal manner. Howell testified that the man had a mustache and long sideburns and was wearing a dark blue cap and a blue jump suit similar to bib overalls. Further, Howell noted that he did not see a gun or money, nor did he recall whether a pickup truck was parked nearby. When Howell drove beside the gas pump he determined the price was too high and left without ever getting out of his car.

About 10:35 a.m. Herbert Clonch stopped at Groce's Store. A man whom he later learned was Dr. Smith was pumping gas out front. As Clonch entered the store, he found Smith's young son standing in the doorway. The doctor followed Clonch into the store. The three discovered Mark Absher lying on the floor behind the counter. While Clonch checked for a pulse and heart beat, the doctor telephoned for an ambulance and the police. Upon finding no heart beat, Clonch decided the victim was dead. Clonch further testified that the cash drawer was closed.

Modesto Scharyj, a medical doctor who specializes in pathology, performed an autopsy on Absher at about 3:30 p.m. the same day. He concluded that Absher died from a single bullet wound to the head. It was his opinion that death ensued within a "very few minutes" after the infliction of the wound. The bullet entered behind the deceased's left ear and traveled in a slightly downward path. The deceased was twenty-two years old and five feet two and one-half inches tall.

No fingerprints of the defendant were found in the store. The cash register had no paper money in it and an accounting revealed approximately eighty dollars ($80.00) missing.

Chief of Police Delbert Wilson of Wilkesboro, testified that at about 1:00 p.m. on 5 February 1982 defendant made an incriminatory statement to him and Wilkes County Deputy Sheriff Gary Phillips. Defendant told them that he agreed to be a "look out" for a man named Mike Lewis who robbed and killed Absher. The Chief of Police testified that his department was unsuccessful in their attempts to locate Lewis.

Special Agent Steve Cabe of the State Bureau of Investigation testified that he interrogated the defendant at approximately 9:00 p.m. on the same day the defendant gave the statement to Chief of Police Wilson. Agent Cabe testified that the defendant told him a more detailed version of the defendant's involvement in the offense, but it was consistent with the statement made to Wilson and Phillips earlier the same day.

Defendant did not present any evidence.

Additional facts relevant to defendant's specific assignments of error, will be incorporated into the opinion.

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Isaac T. Avery, III, for the State.*

*Assistant Appellate Defender Malcolm Ray Hunter, Jr., for the defendant.*

COPELAND, Justice.

Defendant brings forward and argues two assignments of error which he contends require a new trial. We find no error in defendant's trial.

In his first assignment of error defendant urges this Court to find error in the denial of his motion to suppress his inculpatory statements to the authorities. The defendant argues that the uncontradicted evidence showed that the statements were obtained in violation of defendant's *Miranda* rights,[1] specifically, his rights to remain silent and to have counsel present. Furthermore, he contends the trial court failed to resolve conflicts in the evidence presented at the hearing on the motion to suppress.

In this connection the defendant first argues that his two inculpatory statements made to Chief of Police Wilson and SBI Agent Cabe should have been suppressed for the following reasons:

(1) Defendant was not properly informed of his *Miranda* rights prior to the polygraph examination in which he made his first inculpatory statement and therefore, the subsequent statements to Chief Wilson and Agent Cabe were tainted by the initial statement.

(2) The defendant initially invoked his right to counsel under the Sixth Amendment of the United States Constitution through Attorney Paul Freeman and defendant's subsequent waivers were in violation of this right.

In order to properly address these issues, we must review the chain of events which led to the inculpatory statements. On 18 January 1982, the defendant was in custody in Horry County,

---

1. See *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694 (1966), which interpreted the Federal Constitution as affording a criminal defendant specific enumerated rights.

South Carolina. SBI Agent Cabe went to Horry County to discuss with the defendant the charges of obtaining property by false pretenses, which had allegedly occurred in Wilkes County and were unrelated to the Absher murder and armed robbery. At approximately 8:30 p.m. on 18 January 1982, Agent Cabe advised defendant of his *Miranda* rights. Defendant indicated that he wanted an attorney, so no further questions were asked. A few minutes later the defendant initiated a conversation in which he stated he wanted to talk with Agent Cabe without an attorney. After a written waiver of rights was executed, Agent Cabe and defendant discussed matters relating to the false pretense charges only.

The following day, after again being advised of his rights, the defendant was removed to the Wilkes County jail and charged with obtaining property by false pretense. He was not questioned about nor charged with murder and armed robbery.

On 21 January 1982 at approximately 2:30 p.m., Agent Cabe talked with the defendant at the jail about the murder of Mark Absher. Defendant was advised of his *Miranda* rights and he told Cabe at that time that he wanted to talk to him without an attorney. Whereupon, they talked for thirty to forty-five minutes. At that time, the defendant appeared to be in good health, coherent and responsive.

Paul Freeman, an attorney in Wilkes County, was appointed to represent the defendant on the false pretense charges, but not the murder charge. He met with the defendant on 25 January, 2, 3, and 4 February, 1982. At each meeting, Attorney Freeman informed the defendant of his rights. He advised him not to talk to a law enforcement officer. Attorney Freeman told the Sheriff of Wilkes County that he did not want the defendant to talk to anyone. He admitted to the Sheriff that he did not represent the defendant on the murder and armed robbery charges.

In the afternoon of 3 February 1982, Agent Cabe and Chief Wilson talked with the defendant. The defendant agreed to take a polygraph examination with regard to his 21 January statement involving a Tennessee pickup truck at the scene of the murder.

Thereupon, on 5 February 1982, the defendant was taken, with his consent, to Hickory, North Carolina for the purpose of

taking a polygraph examination concerning the Mark Absher murder and armed robbery. Prior to taking the test, SBI Agent Whitman presented the defendant with a standard polygraph waiver of rights form, which defendant signed. This waiver of rights form contained the *Miranda* rights. In addition, Agent Whitman told the defendant that he was not required to answer any question and could leave the room at any time because he was not in custody on the murder and armed robbery charges. The agent advised defendant of the questions he would ask him prior to the examination. At the conclusion of the first chart of the polygraph, Agent Whitman formed an opinion that defendant was being deceptive. Thereupon, he stopped the polygraph examination and told the defendant that they needed to talk. The defendant and Agent Whitman then talked from 10:46 a.m. until approximately 1:00 p.m. Agent Whitman testified that the inculpatory statement was made probably thirty minutes into this discussion.

About 1:00 p.m., Agent Whitman called in Deputy Phillips and Chief Wilson to talk to the defendant. Chief Wilson, in the presence of Deputy Phillips, began informing the defendant of his *Miranda* rights. Defendant told Chief Wilson that he did not need to read the *Miranda* rights to him because he was familiar with them. Nevertheless, defendant was required to remain quiet until the rights were read. According to witnesses for the State, the defendant waived his *Miranda* rights. The defendant then made a statement to Chief Wilson.

Later that night, the defendant gave a similar but more explicit inculpatory statement to Agent Cabe. Again defendant was read his rights prior to the taking of this statement.

[1] Defendant asserts that his Fifth Amendment rights were violated because his admissions to Chief Wilson and Agent Cabe were precipitated by an illegally obtained statement given to Agent Whitman. As a result of defendant's motion to suppress the inculpatory statements, the trial court conducted a voir dire hearing on the admissibility of the statements. In ruling on the motion to suppress, the trial court found that "at no time did Officer Whitman explain the *Miranda* rights to the defendant."

Assuming that the statement to Agent Whitman was made in violation of defendant's *Miranda* rights, we nevertheless find no

relation between that statement and his two subsequent admissions.

In order to conclude that the two subsequent admissions were in fact "fruits of the poisonous tree," pursuant to *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed. 2d 441 (1963), we must first find poison in defendant's statement made while in the polygraph examination room. From the record before us there remains no reasonable means for us to adequately determine whether the first statement tainted the latter two. Neither the State nor the defendant thought to include a substantive account of this alleged admission in the record. Furthermore, this polygraph statement was not introduced at trial and used against the defendant. We also find no showing that the statement was inculpatory. But assuming defendant did make an incriminating admission, there was no evidence presented to indicate that the admission was consistent with the subsequent statements. Finally, the possibility that the original statement caused defendant to give the later two statements, as defendant seems to contend, is but mere conjecture without appreciable facts to substantiate such a claim.

In essence, we are of the opinion that the record reveals nothing which supports a finding that the admissions to Chief Wilson and Agent Cabe were the tainted fruit of the polygraph statement.

[2] Also in connection with defendant's first assignment of error that his statement to the polygraph operator was illegally obtained, defendant contends that the law enforcement officials violated the rule promulgated by the United States Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378 (1981). The *Edwards* rule requires that once a suspected criminal invokes his right to counsel, the interrogation must cease until counsel is provided unless the suspected criminal initiates further dialogue.

Defendant argues that he asserted his right to counsel and his right to remain silent through his attorney Paul Freeman. Freeman, who did not represent defendant on the murder and armed robbery charges, testified that he told the Wilkes County Sheriff that he did not want anyone talking to the defendant about the murder investigation or anything else unless he was notified. The Sheriff did not convey this message to the officials

in charge of that investigation. Freeman also testified that the defendant told him that he didn't want to take the polygraph.

The State presented evidence through the investigating officers that the defendant consistently waived his right to counsel. Agent Cabe testified that he and Chief Wilson explained the polygraph examination twice to defendant, and never did he indicate to them a reluctance to take the examination. Agent Cabe also related that during a conversation with Attorney Freeman, the attorney remarked that he did not "give a damn about the other cases" and that he was only representing the defendant on the false pretense charges.

We attach significance to the fact that Attorney Freeman represented the defendant in a matter unrelated to the Absher murder investigation. As the State points out, prior to defendant's inculpatory statements, defendant was not a suspect in the murder case, but was merely a witness cooperating with law enforcement officials in their investigation. We agree that if Attorney Freeman had represented the defendant on the murder and robbery charges, he could have controlled access to the defendant.

However, the law in this State is that a "defendant may waive the presence of an attorney in a case under investigation when the attorney represents him on an unrelated charge." *State v. Patterson,* 288 N.C. 553, 568, 220 S.E. 2d 600, 611 (1975), *modified,* 428 U.S. 904 (1976). We further held in *State v. Smith,* 294 N.C. 365, 241 S.E. 2d 674 (1978), that the fact that an attorney represents a defendant on an unrelated charge *does not* mean that he represents that defendant on all criminal charges.

In *Smith,* the defendant, at the time of his arrest for murder, was in jail awaiting trial on unrelated charges of forgery and armed robbery. An attorney represented the defendant on the forgery charges, but not the armed robbery charge. The defendant was interrogated by the district attorney, in the presence of his attorney, about information defendant claimed to have on a murder which the police were investigating. When the district attorney refused to bargain with the defendant, the interrogation ceased. Two days later, he incriminated himself which caused his arrest and subsequent conviction of murder. Chief Justice Sharp, speaking for the Court, rejected defendant's contention that the

presence of his attorney "was a prerequisite to a valid waiver of his right to remain silent and to have counsel present during any custodial interrogation." *Id.* at 373, 241 S.E. 2d at 679.

In the instant case, the defendant essentially appears to be advocating that we adopt a rule similar to the one first espoused by the New York Court of Appeals in *People v. Arthur*, 22 N.Y. 2d 325, 292 N.Y.S. 2d 663, 239 N.E. 2d 537 (1968). As we have previously held, this New York rule, "that a defendant in custody who is represented by counsel may not waive his constitutional rights in counsel's absence, is not the law in this State." *Smith*, 294 at 375, 241 S.E. 2d at 680. We hold that Attorney Freeman could not validly assert the defendant's Fifth and Sixth Amendment rights with regard to charges on which he did not represent the defendant.

It is uncontradicted that a criminal defendant's right to counsel under the Sixth Amendment attaches upon the institution of adversary judicial proceedings, be that "by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 32 L.Ed. 2d 411, 417 (1972); *State v. Franklin*, 308 N.C. 682, 688, 304 S.E. 2d 579, 583 (1983).

At the time of defendant's statements to the polygraph examiner, the State had not initiated judicial proceedings against defendant for the Absher murder. The record indicates that when the defendant entered the polygraph test room, SBI Agent Whitman explained to him that "he was not in custody concerning the Mark Absher murder and that he was free to leave that room at any time. . . . [I]f at any time he decided he wanted to stop talking . . . he was free to leave."

We, therefore, are of the opinion that there was no violation of the *Edwards* rule in this case. The defendant's Sixth Amendment right to counsel in the Absher murder had not attached prior to defendant making inculpatory statements. Furthermore, the defendant had not invoked his right to counsel with respect to the murder investigation and charge.

Nevertheless, had the defendant invoked his rights to counsel and to remain silent, he still would have retained his prerogative to subsequently waive these rights and cooperate with the law

enforcement authorities. *U.S. v. Hart*, 619 F. 2d 325 (4th Cir. 1980); *State v. Fincher*, 309 N.C. 1, 305 S.E. 2d 685 (1983).

In *Jordan v. Watkins*, 681 F. 2d 1067 (5th Cir. 1982), *reh. den.*, 688 F. 2d 395 (1982), the Fifth Circuit Court of Appeals reasserted that an accused may validly choose to waive his rights and respond to questioning. The rationale for this recognized principle, as stated in *Jordan*, can be attributed to the United States Supreme Court opinion of *Michigan v. Mosley*, 423 U.S. 96, 46 L.Ed. 2d 313 (1975). There the court reasoned that "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Id.* at 102, 46 L.Ed. 2d at 320.

Further, the right to counsel can be waived without notice to an attorney. In *Brewer v. Williams*, 430 U.S. 387, 51 L.Ed. 2d 424 (1977), the Supreme Court, in excluding a confession made in the absence of retained counsel during a critical stage, held that the Sixth Amendment right to counsel could be waived without notice to the attorney. Mr. Justice Stevens writing for the court held:

> The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments.

*Id.* at 405-6, 51 L.Ed. 2d at 441.

Since we have determined that no violation of the *Edwards* rule occurred in the case *sub judice*, our next inquiry is whether the defendant's admissions were the result of a voluntary, knowing and intelligent waiver of his fifth and sixth amendment rights. This crucial question must be favorably resolved before a confession can be deemed admissible. *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982). In any case the validity of a waiver must be determined by analyzing "the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *Oregon v. Bradshaw*, --- U.S. ---, 77

L.Ed. 2d 405, 413 (1983) (quoting *North Carolina v. Butler*, 441 U.S. 369, 374-375, 60 L.Ed. 2d 286, 293 (1979) and *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L.Ed. 1461, 1466 (1938) ); *State v. Rook*, 304 N.C. 201, 216, 283 S.E. 2d 732, 742 (1982), *cert. den.* 455 U.S. 1038 (1982).

The record discloses that the defendant was informed of his Miranda rights by the law enforcement officers at least three times before being taken to Hickory for the polygraph test. Each time he responded that he understood his rights. In his first encounter with officials, defendant asserted his right to counsel, but within minutes, upon his own initiative, waived that right. Thereafter, he never requested the presence of his attorney during questioning, nor did he refuse to answer any question. We note that defendant had been advised of his rights by Attorney Freeman on at least four occasions before taking the polygraph. The polygraph waiver form, which defendant signed was similar to the waiver forms encountered by defendant on previous occasions. Finally, according to Chief Wilson's testimony, the defendant, on 5 February 1982, prior to Chief Wilson informing him of his rights, "started explaining and making a statement." Upon asking defendant to wait until his rights were read, the defendant answered that the officers "didn't need to read them [the rights] to him because he was familiar with them."

The trial court, after an extensive voir dire hearing, concluded that defendant's two statements to Chief of Police Wilson and Agent Cabe were admissible, for the reasons that the defendant was fully advised of his constitutional rights according to the *Miranda* decision, no threats or promises or hopes of reward were made or given to the defendant and his statements were freely and voluntarily made.

This conclusion is based upon and supported by findings of fact that are well supported by the voir dire testimony. Accordingly, these findings and conclusions are binding upon this Court on appeal. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335 (1983).

Defendant claims that the trial court's failure to resolve conflicts presented at the hearing on his motion to suppress was prejudicial error. Although the record reveals conflicting evidence, the trial court's findings of fact, as we have stated, were supported by substantial competent evidence. Therefore, we

will not disturb the trial court's ruling, regardless of the fact that evidence existed from which a different conclusion could have been reached. *Williams*, 308 at 60, 301 S.E. 2d at 344.

Under the second assignment of error the defendant contends that the court erred in denying the defendant's pretrial motion to prohibit death qualification of the jury, permitting the State to ask death qualification questions and allowing the State to strike for cause jurors opposed to the death penalty. The defendant argues that the process of death qualifying the jury prior to the guilt phase of a capital case and requiring the same jury to hear both the guilt and the penalty phase of the trial is unconstitutional. The defendant concedes that our Court has decided this claim against him in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980) and has recently affirmed the *Avery* decision in *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. den.* --- U.S. ---, 77 L.Ed. 2d 1398 (1983) and *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982). We have re-examined our position and reaffirm our previous holdings.

We conclude that the defendant received a fair trial free of prejudicial error.

No error.

Justice EXUM dissenting.

I disagree with the majority's position that the false pretense and the murder cases were unrelated. The majority correctly notes "that if attorney Freeman had represented the defendant on the murder and robbery charges, he could have controlled access to the defendant." Because, under the circumstances here, the murder and robbery charges were related, I believe that at the time Freeman advised Sheriff Gentry that no one should talk to his client, Freeman was in fact speaking for his client on both the false pretense and the murder charges, although he had only been formally appointed in the false pretense cases. At least the evidence before the trial court at the voir dire hearing on admissibility was such that the trial court should have resolved any questions of fact regarding the relationship of the false pretense cases to the murder case.

Freeman was appointed to represent the defendant in the false pretense cases on 25 January 1982. Before this appointment, SBI Agent Cabe had discussed with defendant the murder case on 21 January 1982. Defendant had admitted his guilt in the false pretense cases to Cabe and had told Cabe that he knew something about the Absher murder. According to Freeman's testimony, Cabe told Freeman that defendant "had been cooperating with them in another matter." Freeman asked if it was serious and Cabe said, "Yes, it is a murder, a homicide." Freeman then discussed with Cabe the possibility of a plea bargain in the false pretense cases if defendant would cooperate with the prosecution in the murder case. Cabe was receptive to this idea. Thereafter, Freeman spoke to defendant and defendant admitted that he had made a statement to law enforcement investigators about "another case." Freeman advised defendant not to talk with anybody. Freeman then learned that the other murder case involved the Absher killing.

Freeman spoke with Sheriff Gentry, one of whose deputies was involved in the Absher murder investigation. Gentry told Freeman that he understood defendant "had been cooperating" in the murder investigation. Freeman told Gentry that he "didn't want anybody talking to Mr. Bauguss about that or anything else unless I was notified." Although Sheriff Gentry advised Freeman that the murder investigation was "not my case," the sheriff agreed to "pass the word along."

On 4 February defendant advised Freeman that Agent Cabe and Chief of Police Delbert Wilson wanted him to take a polygraph examination "about the Absher matter." Freeman advised defendant that he did not have to take the polygraph and that if he did not want to take it, he should not take it. Defendant told Freeman that although he had earlier agreed with the officers to take the polygraph, "he had changed his mind and he didn't understand why they wanted him to take it." Freeman told defendant that he would "try to find out more about it."

Later on 4 February Freeman received a call from Chief Wilson. During this telephone conversation Freeman advised Wilson that defendant did not want to take the polygraph and he asked Chief Wilson "why it is that you want him to take the polygraph." Chief Wilson said, "It is part of our investigation." Freeman ad-

vised the chief that defendant was "not going to take the poly-graph test or talk to anybody until you tell me what this is all about." Chief Wilson replied that Freeman did not represent defendant on anything but the false pretense cases. Freeman replied, "No I don't represent him on anything else, Delbert, but it is my duty as an attorney and I have a client and I see he is in a situation where he may get himself in danger, then I have to look out for his best interest whether I represent him on that par-ticular charge or not." Chief Wilson refused to tell Freeman why they wanted defendant to take a polygraph and what the subject of the polygraph examination would be. Freeman ended the con-versation by telling the chief, "You think about it and let me know but until you let me know, Bauguss is not going to take a polygraph and he is not going to talk to anybody and I don't want anybody talking to him."

On 5 February 1982, without the knowledge of defendant's at-torney, Freeman, the investigators took defendant to Hickory, North Carolina, where the polygraph was administered. It con-cerned the Absher murder case. The polygraph operator, Whit-man, testified that the examination indicated deception on defendant's part. Whitman said, "At this time I stopped the . . . polygraph and told him I felt like we needed to talk." Whitman and defendant then talked from 10:46 a.m. until approximately 1 p.m. "Less than thirty minutes" into the conversation, defendant made a statement to Whitman "implicating himself in the death of Mark Absher."

If Freeman's testimony is true, the false pretense cases were indeed related to the murder case. Freeman was trying to work out a plea bargain in the false pretense cases in return for defend-ant's cooperation in the murder case. Although Freeman had not formally been appointed as counsel in the murder case, he was in fact advising and speaking for defendant with regard to it. Under these circumstances, I think Freeman had the right to control ac-cess to his client. When law enforcement officers ignored Freeman's admonitions and continued to interrogate defendant about the Absher murder case despite these admonitions, they deprived defendant of his Sixth Amendment right to counsel.

Sheriff Gentry admitted that Freeman told him that "he didn't want anybody talking with his client, Mr. Bauguss." Sheriff Gentry replied, "Okay." Although the sheriff knew that one of his deputies was involved in the Absher murder investigation and that other agencies were also involved, he did not pass on Freeman's request to his own investigating deputy, or anyone else.

It is, therefore, uncontradicted that Freeman advised the sheriff that he did not want any officers talking to his client. I think the sheriff had a duty to pass this admonition along to others whom he knew were involved in the Absher murder investigation. Since Freeman's conversation with Sheriff Gentry is not contradicted, this is enough to conclude that defendant's Sixth Amendment right to counsel was violated.

I recognize that Police Chief Wilson denied that Freeman ever told him not to talk to defendant. Chief Wilson said that Freeman told him only that Mr. Bauguss should not take the polygraph unless and until he was fully advised of the reasons for it. Neither did Agent Cabe corroborate Freeman's testimony regarding the plea bargain discussion.

There is, therefore, some conflict in the evidence regarding what Freeman said to Chief Wilson and what he said to Cabe. The trial court did not resolve this conflict. If resolution of the conflict is necessary in order to determine whether defendant was denied his right to counsel, then I think the matter should be remanded to the trial court for that purpose.

Justice FRYE joins in this dissent.